STATE OF CONNECTICUT *v.* LAKE SPEARS
(15117)

CALLAHAN, BORDEN, BERDON, NORCOTT and KATZ, Js.

Argued April 21—decision released July 4, 1995

*C. Robert Satti, Sr.*, special assistant state's attorney, with whom were *Sarah E. Steere*, legal intern, and, on the brief, *Kevin T. Kane*, state's attorney, for the appellant (state).

*Richard D. Haviland*, for the appellee (defendant).

*Christopher F. Droney*, United States attorney, and *Carl J. Schuman*, assistant United States attorney, filed a brief for the United States of America as amicus curiae.

*Richard Blumenthal*, attorney general, and *Susan Quinn Cobb*, assistant attorney general, filed a brief for the attorney general as amicus curiae.

*Jackson T. King, Jr., Patrice H. Kunesh* and *Henry J. Sockbeson* filed a brief for the Mashantucket Pequot Indian tribe as amicus curiae.

CALLAHAN, J. The sole issue in this certified appeal is whether the state of Connecticut has jurisdiction, pursuant to § 1755 of title 25 of the United States Code, over crimes committed on the Mashantucket Pequot Indian Reservation (reservation) in Ledyard. On November 29, 1991, the defendant, Lake Spears, was arrested by a Connecticut state trooper who had responded to an anonymous telephone call alerting the police to a disturbance at the defendant's residence. The defendant resided at 8 Elizabeth George Drive, on the reservation. Subsequent to his arrest, the defendant was charged in an information in the Superior Court with two counts of assault of an officer in violation of General Statutes § 53a-167c, and one count each of inciting injury to persons or property in violation of General Statutes § 53a-179a, disorderly conduct in violation of General Statutes § 53a-182 and interfering with an officer in violation of General Statutes § 53a-167a.

On October 13, 1992, the defendant moved to dismiss the information, claiming that the state lacked jurisdiction over crimes committed by or against Indians on the reservation.[1] The parties agreed that the Mashantucket Pequot Indian tribe (tribe) is a federally recognized tribe that owns and occupies the reservation encompassing approximately 1800 acres in Ledyard. The defendant is a member of the Narrangansett Indian tribe, not the Mashantucket Pequot Indian tribe.[2]

The trial court denied the motion to dismiss, concluding that the Connecticut Indian Land Claims Settlement Act of 1983 (Settlement Act); 25 U.S.C. §§ 1751 through 1760; conferred criminal jurisdiction over the reservation to the state. Thereafter, the defendant entered pleas of nolo contendere to all counts of a substitute information that charged him, in three counts, with: (1) interfering with an officer in violation of § 53a-167a; (2) assault in the third degree in violation of General Statutes § 53a-61; and (3) disorderly conduct in violation of § 53a-182. The defendant conditioned the entry of his pleas on his right to appeal from the court's denial of his motion to dismiss. See General Statutes § 54-94a; Practice Book § 4003.[3] The trial court rendered a judgment of conviction on all three counts.

---

[1] The trial court granted the Mashantucket Pequot Indian tribe's motion to file a brief as amicus curiae regarding the motion to dismiss. The tribe claimed that the issue in this case would have a lasting effect on its relationship with the state. The trial court also granted the United States amicus curiae status. Before this court, the tribe, the United States and the state attorney general filed briefs as amici curiae.

[2] All parties agree that the fact that the defendant is not a member of the Mashantucket Pequot Indian tribe has no legal significance in this appeal.

[3] General Statutes § 54-94a provides: "CONDITIONAL NOLO CONTENDERE PLEA. APPEAL OF DENIAL OF MOTION TO SUPPRESS OR DISMISS. When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable

82

Thereafter, the defendant appealed to the Appellate Court from the judgment of conviction, challenging the trial court's denial of his motion to dismiss. The Appellate Court reversed the judgment of conviction, concluding that the Settlement Act did not confer criminal jurisdiction over the reservation to the state in the

search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

Practice Book § 4003 provides: "(a) When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution. The court shall not accept a nolo contendere plea pursuant to this subsection where the denial of the motion to suppress would not have a significant impact upon the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere plea where the record available for review of the denial of the motion to suppress or motion to dismiss is inadequate for appellate review of the court's determination thereof.

"(b) With the approval of the court, after a hearing to consider any objections thereto, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any motion made prior to the close of evidence, which motion must be specified in such written reservation. If the defendant prevails on appeal, the judgment shall be set aside and the defendant shall be allowed to withdraw the conditional plea of nolo contendere after the case has been remanded to the trial court. The court shall not accept a plea of guilty or nolo contendere pursuant to this subsection where the adverse determination of the specified motion would not have a significant impact on the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere or guilty plea where the record available for review of the ruling upon the specified motion is inadequate for appellate review of the court's determination thereof."

absence of the express consent of the tribe. *State* v. *Spears*, 36 Conn. App. 106, 122–23, 647 A.2d 1054 (1994). The Appellate Court, accordingly, remanded the case to the trial court with direction to grant the defendant's motion to dismiss. We granted the state's petition for certification limited to the following issue: "Under the circumstances of this case, did the Appellate Court properly conclude that the state of Connecticut does not have jurisdiction over crimes allegedly committed by the defendant on the Mashantucket Pequot Indian Reservation in Ledyard?" *State* v. *Spears*, 231 Conn. 936, 650 A.2d 173 (1994). We reverse the judgment of the Appellate Court.

On appeal, the state claims that, although the Settlement Act granted federal recognition to the tribe, it also granted jurisdiction over crimes committed on the reservation to the state. See 25 U.S.C. §§ 1758 (a) and 1755. The state contends that § 1755 constituted an express grant by Congress of criminal jurisdiction over the reservation to the state, and that jurisdiction was vested in the state upon the passage of the Settlement Act, without requiring any further consent by the tribe. We agree.

The tribe is "the sole successor in interest to the aboriginal entity known as the Western Pequot Tribe which years ago claimed aboriginal title to certain lands in the State of Connecticut." 25 U.S.C. § 1751 (e). In 1976, the tribe brought a civil action claiming title to certain public and private lands in Ledyard, claiming that the lands were the property of the tribe and had been appropriated wrongfully from the tribe in violation of the constitution and laws of the United States. *Mashantucket Pequot Tribe* v. *McGuigan*, 626 F. Sup. 245, 246 (D. Conn. 1986). The Settlement Act reflects an agreement reached by the parties to the litigation to resolve the tribe's claims and to eliminate the cloud on titles to land in Ledyard resulting from those claims.

25 U.S.C. § 1751; *Mashantucket Pequot Tribe* v. *McGuigan*, supra, 246. The Mashantucket Pequot Tribal Council was represented in the action as well as in the hearings before Congress, and manifested its consent to the terms of the Settlement Act. 25 U.S.C. § 1751 (e).

Section 6 of the Settlement Act, which is codified at 25 U.S.C. § 1755, provides: "STATE JURISDICTION OVER RESERVATION. Notwithstanding the provision relating to a special election in section 406 of the Act of April 11, 1968 (82 Stat. 80; 25 U.S.C. 1326) . . . the reservation of the Tribe is declared to be Indian country subject to State jurisdiction to the maximum extent provided in title IV of such Act [25 U.S.C. § 1321]." The issue of whether § 6 of the Settlement Act conferred criminal jurisdiction to the state without requiring further consent of the tribe is one of first impression.[4]

At the outset, we note that criminal offenses committed by or against Indians in "Indian country"[5]

---

[4] In *Mashantucket Pequot Tribe* v. *McGuigan*, supra, 626 F. Sup. 245, the United States District Court for the District of Connecticut considered whether Connecticut's bingo laws were enforceable on the reservation. The court, in considering the effect of § 1755, stated: "While Public Law 98-134 eliminates the consent election provided in 25 U.S.C. § 1326, it may have created an anomaly by the fact that it does not eliminate the consent requirement of 25 U.S.C. § 1321." Id., 248. The court, however, expressly reserved the question of whether the state had acquired criminal jurisdiction over the reservation because it concluded that the bingo laws were not criminal laws, but rather were "civil/regulatory." In *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter*, 217 Conn. 612, 615 n.3, 587 A.2d 139 (1991), this court misstated the holding of *McGuigan* in dicta.

[5] "Indian country" is defined in § 1151 of title 18 of the United States Code, which provides in relevant part: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . ." As a threshold matter, we note that the tribe is a federally recognized Indian tribe; 25 U.S.C. § 1758; and occupies a reservation of land in Ledyard pursuant to General Statutes § 47-63. The reservation is, therefore, Indian country. See also 25 U.S.C. § 1755.

ordinarily "have been subject only to federal or tribal laws, *Moe* v. *Salish & Kootenai Tribes*, 425 U.S. 463, 96 S. Ct. 1634, 48 L. Ed. 2d 96 [1976], except where Congress in the exercise of its plenary and exclusive power over Indian affairs has 'expressly provided that State laws shall apply.' *McClanahan* v. *Arizona State Tax Commission*, 411 U.S. 164, 170–71, 93 S. Ct. 1257, 36 L. Ed. 2d 129 [1973]." *Washington* v. *Yakima Indian Nation*, 439 U.S. 463, 470–71, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979); see *Worcester* v. *Georgia*, 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1832).[6] We also recognize that "ambiguities in legislation affecting retained tribal sovereignty are to be construed in favor of the [tribe]." *Washington* v. *Yakima Indian Nation,* supra, 484; see also *Bryan* v. *Itasca County*, 426 U.S. 373, 392, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976) (" 'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians' "). We, however, must effectuate the expressed Congressional intent. See *Negonsott* v. *Samuels*, 507 U.S. 99, 104, 113 S. Ct. 1119, 122 L. Ed. 2d 457 (1993) (" '[o]ur task is to give effect to the will of Congress' "); *Gonsalves* v. *West*

---

[6] Congress has conferred on the federal courts special criminal jurisdiction over offenses committed in Indian country. See *Negonsott* v. *Samuels*, 507 U.S. 99, 102–103, 113 S. Ct. 1119, 122 L. Ed. 2d 457 (1993). The Indian Country Crimes Act, codified at 18 U.S.C. § 1152, applies to crimes committed by non-Indians against Indians and to crimes committed by Indians against non-Indians not encompassed by other statutes or prosecuted in a tribal court. See *Williams* v. *United States*, 327 U.S. 711, 714, 66 S. Ct. 778, 90 L. Ed. 962 (1946); F. Cohen, Handbook of Federal Indian Law (1982 Ed.) pp. 287–300. The Indian Major Crimes Act establishes as federal crimes certain felonies committed by any Indian in Indian country "against the person or property of another Indian or other person . . . ." 18 U.S.C. §§ 1153, 3242. *In the absence of an express grant of state jurisdiction by Congress*, state jurisdiction within Indian country "is limited to crimes by non-Indians against non-Indians . . . and victimless crimes by non-Indians." *Solem* v. *Bartlett*, 465 U.S. 463, 465 n.2, 104 S. Ct. 1161, 79 L. Ed. 2d 443, reh. denied, 466 U.S. 948, 104 S. Ct. 2148, 80 L. Ed. 2d 535 (1984).

*Haven,* 232 Conn. 17, 21, 653 A.2d 156 (1995) (" ' "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature" ' ").

Our analysis of the statutes reflecting that legislative intent is guided by well established principles of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. *North Haven* v. *Planning & Zoning Commission,* 220 Conn. 556, 561, 600 A.2d 1004 (1991)." *Davis* v. *Norwich,* 232 Conn. 311, 317, 654 A.2d 1221 (1995). Ordinarily, if the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent. *United States* v. *Albertini,* 472 U.S. 675, 680, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985); *Frillici* v. *Westport,* 231 Conn. 418, 430, 650 A.2d 557 (1994); *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* 228 Conn. 498, 508, 636 A.2d 1342 (1994); *American Universal Ins. Co.* v. *DelGreco,* 205 Conn. 178, 193, 530 A.2d 171 (1987). As a threshold matter, therefore, we consider whether § 1755 is ambiguous. Although § 1755 explicitly states that "the reservation of the Tribe is declared to be Indian country subject to State jurisdiction," it also compels us to refer to § 401 (25 U.S.C. § 1321) and to § 406 (25 U.S.C. § 1326) of the Indian Civil Rights Act of 1968 in order to ascertain the parameters and the true meaning of the jurisdictional grant. We conclude, therefore, that the reference in § 1755 to certain provisions of the separate Indian Civil Rights Act renders resort solely to the language of § 1755 inadequate to determine its clear meaning.

When we engage in statutory interpretation, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . *Fleming* v. *Garnett,* 231 Conn. 77, 91-92, 646 A.2d 1308 (1994); *State* v. *Metz,* 230 Conn. 400, 409, 645 A.2d 965

(1994); see also *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994)." (Internal quotation marks omitted.) *Gonsalves* v. *West Haven*, supra, 232 Conn. 21; see *Negonsott* v. *Samuels*, supra, 507 U.S. 104. "In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Ambroise* v. *William Raveis Real Estate, Inc.*, [226 Conn. 757, 764, 628 A.2d 1303 (1993)]; see *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, 227 Conn. 848, 852–57, 633 A.2d 305 (1993). . . . *State* v. *Metz*, [supra, 409]; *Fleming* v. *Garnett*, [supra, 91]." (Citations omitted; internal quotation marks omitted.) *Frillici* v. *Westport*, supra, 231 Conn. 431–32; *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 96, 612 A.2d 1130 (1992); see *Oklahoma* v. *New Mexico*, 501 U.S. 221, 235 n.5, 111 S. Ct. 2281, 115 L. Ed. 2d 207 (1991) ("we repeatedly have looked to legislative history and other extrinsic material when required to interpret a statute which is ambiguous"); *Green* v. *Bock Laundry Machine Co.*, 490 U.S. 504, 511, 109 S. Ct. 1981, 104 L. Ed. 2d 557 (1989); *Pierce* v. *Underwood*, 487 U.S. 552, 564–65, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988); *Blum* v. *Stenson*, 465 U.S. 886, 896, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984).

Section 1321 (a) of title 25 of the United States Code provides: "The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, *with the consent of the Indian tribe occupying the particular Indian country or part thereof which*

88

*could be affected by such assumption,* such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State *to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State,* and the criminal laws of such State *shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.*" (Emphasis added.) Section 1326 of title 25 of the United States Code provides in relevant part: "State jurisdiction acquired pursuant to this title . . . with respect to criminal offenses . . . shall be applicable in Indian country *only where the enrolled Indians* within the affected area of such Indian country *accept such jurisdiction by a majority vote of the adult Indians voting at a special election* held for that purpose. . . .*" (Emphasis added.)

The issue in this appeal boils down to the question of whether, as the defendant argues, an abstract consent requirement expressed in § 1321 survived even though Congress in § 1755 expressly eliminated the mechanism of a special election, which is set forth in § 1326, by which tribes must manifest their consent to state jurisdiction. Section 1755 provides for state jurisdiction over crimes committed on the reservation "[n]otwithstanding the provision relating to a special election in section 406 of the Act of April 11, 1968 [§ 1326]." In order to discern the intent of Congress in enacting § 1755, we need comment upon the Indian Civil Rights Act of April 11, 1968, which was preceded by Public Law 83-280. See Public Law 83-280, 67 Stat. 588–90 (1953), codified, as amended, at 18 U.S.C. § 1162 and 28 U.S.C. § 1360.

Public Law 83-280, enacted in 1953, was the first federal jurisdictional statute of general applicability to Indian reservation lands; *Bryan* v. *Itasca County,* supra, 426 U.S. 379; and "the primary expression of

federal policy governing the assumption by States of civil and criminal jurisdiction over the Indian Nations." *Three Affiliated Tribes of the Fort Berthold Reservation* v. *Wold Engineering*, 476 U.S. 877, 884, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986). Public Law 83-280 granted criminal jurisdiction to five states, not including Connecticut,[7] over Indian country in those five states.[8] It also provided an option to the remaining states containing Indian country to assume jurisdiction over crimes committed in Indian country "without consulting with or securing the consent of the tribes that would be affected." *Washington* v. *Yakima Indian Nation*, supra, 439 U.S. 473–74. The primary purpose for enacting Public Law 83-280 was to address "the 'problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement.' " Id., 471.

In 1968, Congress enacted title IV of the Indian Civil Rights Act, which is codified at 25 U.S.C. §§ 1321 through 1326. Title IV requires that all subsequent assertions of jurisdiction by the states be preceded by the consent of the affected tribes. "The impetus for the addition of a consent requirement in the 1968 amendments was congressional dissatisfaction with the involuntary extension of state jurisdiction over Indians who did not feel they were ready to accept such jurisdiction, or who felt threatened by it." *Three Affiliated Tribes of the Fort Berthold Reservation* v. *Wold Engineering*, supra, 476 U.S. 892, citing S. Rep. No. 721, 90th Cong., 1st Sess. 32 (1967).

The United States Supreme Court has determined that the special election requirement in § 1326 is the

---

[7] At the time that Public Law 83-280 was enacted, there were no federally recognized Indian tribes in Connecticut.

[8] The five states given immediate jurisdiction were California, Minnesota, Nebraska, Oregon and Wisconsin. Alaska was added to this group in 1958. See 18 U.S.C. § 1162; 28 U.S.C. § 1360.

*only* procedure by which the tribal consent in § 1321 may be manifested. "We think the meaning of these provisions is clear: the tribal consent that is prerequisite to the assumption of state jurisdiction under the provisions of Title IV of the Act *must be manifested* by majority vote of the enrolled Indians within the affected area of Indian country." (Emphasis added.) *Kennerly* v. *District Court of Montana*, 400 U.S. 423, 429, 91 S. Ct. 480, 27 L. Ed. 2d 507 (1971), citing 114 Cong. Rec., S394 (1968) ("[t]his title . . . authorizes States to assert civil and criminal jurisdiction in Indian country only after acquiring the consent of the tribes in the States by referendum of all reservated Indians"). It follows, then, that the nullification by § 1755 of the special election requirement, the sole means by which Indian tribes may consent to state jurisdiction, accompanied by an express grant of jurisdiction to the state, effectively nullifies the tribal consent requirement in § 1321.

"We presume that the legislature is aware of the judicial construction placed upon its enactments. *Cappellino* v. *Cheshire*, 226 Conn. 569, 576, 628 A.2d 595 (1993); *Lumbermens Mutual Casualty Co.* v. *Huntley*, 223 Conn. 22, 30, 610 A.2d 1292 (1992)." *State* v. *Crowell*, 228 Conn. 393, 401, 636 A.2d 804 (1994); see *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, 229 Conn. 312, 321, 640 A.2d 101 (1994) ("[W]e presume that the legislature has 'knowledge of this longstanding construction which this court has given to the objective and purpose of legislation in this field.' *Klapproth* v. *Turner*, 156 Conn. 276, 279, 240 A.2d 886 [1968]."); see also *Rodriguez* v. *United States*, 480 U.S. 522, 525, 107 S. Ct. 1391, 94 L. Ed. 2d 533 (1987) ("Congress acted—as it is presumed to act . . . with full awareness of the well-established judicial interpretation [of the statute]" [citation omitted]). Section 1755, therefore, must be interpreted in light of the United

State Supreme Court's interpretation of §§ 1321 and 1326. Moreover, "[a] statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus, it is not proper to confine interpretation to the one section to be construed." 2A J. Sutherland, Statutory Construction (5th Ed. 1992) § 46.05, p. 103; see also *Digital Equipment Corp.* v. *Desktop Direct, Inc.*, 511 U.S.    , 114 S. Ct. 1992, 2002, 128 L. Ed. 2d 842 (1994) ("courts should construe statutes to foster harmony with other statutory and constitutional law").

We must interpret § 1755 so that it, along with §§ 1321 and 1326, constitutes one consistent body of law. Section 1321 provides that the affected tribe must indicate consent to state criminal jurisdiction. Section 1321, however, does not provide a procedure for the tribe to manifest that consent. Section 1326, on the other hand, provides the *one* method authorized by Congress by which the tribe may consent to state jurisdiction. The only way to harmonize these provisions with each other and with § 1755 is to conclude that the abrogation of the only method of consent abrogated the necessity for consent.

The defendant argues, however, that by abrogating the requirement for a special election, Congress in § 1755 did not intend to confer criminal jurisdiction to the state without the necessity for tribal consent. Instead, the defendant argues that Congress intended to recognize the increasing sophistication of Indian tribes and to allow the Mashantucket Pequot tribe greater freedom by permitting it to manifest its consent to jurisdiction by some undelineated method or methods. This interpretation of congressional intent is flawed. It is illogical to place both the state and the tribe in the predicament of guessing at the proper

manifestation of consent. See, e.g., *Golden Hill Paugussett Tribe of Indians* v. *Southbury*, 231 Conn. 563, 651 A.2d 1246 (1995) (dispute between tribal chief and tribal council regarding authority to bring action on behalf of tribe resulting in dismissal). Such an interpretation would lead to the unlikely result that Congress intended that some undisclosed method of signaling consent should be utilized by the Mashantucket Pequot tribe, but not by other Indian tribes, even though there has been but a single recognized method since 1968 by which all Indian tribes may declare their consent to state jurisdiction.

"[P]rinciples of statutory construction . . . require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. *Turner* v. *Turner*, 219 Conn. 703, 712, 595 A.2d 297 (1991). We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve. *Peck* v. *Jacquemin*, 196 Conn. 53, 63–64, 491 A.2d 1043 (1985). [*Turner* v. *Turner*, supra,] 713. *Scrapchansky* v. *Plainfield*, 226 Conn. 446, 453, 627 A.2d 1329 (1993); see also *State* v. *Johnson*, [227 Conn. 534, 542, 630 A.2d 1059 (1993)]; *Fairfield Plumbing & Heating Supply Corp.* v. *Kosa*, 220 Conn. 643, 650–51, 600 A.2d 1 (1991)." (Internal quotation marks omitted.) *Concept Associates, Ltd.* v. *Board of Tax Review*, 229 Conn. 618, 624, 642 A.2d 1186 (1994). "It is also a rule of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results. . . . *State* v. *Siano*, 216 Conn. 273, 278, 579 A.2d 79 (1990), and cases cited therein." *State* v. *Harrison*, 228 Conn. 758, 765, 638 A.2d 601 (1994); see *United States* v. *Rutherford*, 442 U.S. 544, 552, 99 S. Ct. 2470, 61 L. Ed. 2d 68 (1979). Without running afoul of the accepted rules of statutory construction, we cannot construe the

immediate, definitive grant of state jurisdiction in § 1755 to be subject to subsequent tribal consent, the method of declaring which is unknown to Congress, the state and the tribe.

The defendant's proposed interpretation of § 1755 also would render everything in the statute, except for the elimination of the special election requirement of § 1326, superfluous. Section 1755 provides that "the reservation . . . is declared to be Indian country subject to State jurisdiction . . . ." If, as the defendant argues, the consent of the tribe was still necessary to confer criminal jurisdiction on the state after the passage of the Settlement Act, this language would amount to nothing more than a manifestation of Congress' consent to state jurisdiction with the consent of the tribe. In § 1321, Congress, however, already had manifested its express consent to any state to assume jurisdiction over Indian country with tribal consent; consequently, no purpose would be served by doing so again in § 1755. Our conclusion, therefore, that the state automatically assumed criminal jurisdiction over the reservation upon passage of the Settlement Act, is the only interpretation of the statutory scheme which is not redundant and which gives meaning to every clause of § 1755.

"It is a basic tenet of statutory construction that the legislature 'did not intend to enact meaningless provisions.' *Turner* v. *Turner*, [supra, 219 Conn. 713]. Accordingly, care must be taken to effectuate all provisions of the statute. See *Pintavalle* v. *Valkanos*, 216 Conn. 412, 418, 581 A.2d 1050 (1990) ('[a] statute should be read as a whole and interpreted so as to give effect to all of its provisions'); *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980) (it is a 'well established principle that statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant')." *Bridgeport Hospital* v. *Com-*

*mission on Human Rights & Opportunities*, 232 Conn. 91, 100–101, 653 A.2d 782 (1995); see also *Negonsott v. Samuels*, supra, 507 U.S. 106 ("[o]ur reading of the . . . Act is the only one which gives effect 'to every clause and word of [the] statute' "); 2A J. Sutherland, supra, § 46.06, pp. 119–20.

The legislative history of the Settlement Act also persuades us that the intent of Congress in enacting § 1755 was to confer criminal jurisdiction to the state without the requirement of tribal consent. As stated in both the Senate and the House of Representative Reports, "[s]ection 6 [§ 1755] provides that the reservation . . . is subject to the full extent of State jurisdiction . . . as defined in title IV of the Act of April 11, 1968, the Indian Civil Rights Act. The Tribe's reservation *has this status* notwithstanding section 406 of the Indian Civil Rights Act [§ 1326] which requires a majority vote of the enrolled members of an Indian tribe before a state may assume jurisdiction over that tribe." (Emphasis added.) S. Rep. No. 222, 98th Cong., 1st Sess. 16 (1983); see also H.R. Rep. No. 43, 98th Cong., 1st Sess. 10 (1983). The reservation would not obtain the "status" of being under state jurisdiction upon the enactment of § 1755 if Congress had intended that subsequent tribal consent was required to confer jurisdiction to the state.

Interestingly, the tribe's own ordinances, enacted subsequent to the Settlement Act, manifest the tribe's acceptance of state jurisdiction. The ordinances clearly indicate that the tribe acknowledged the state's acquisition of jurisdiction, pursuant to § 1755, over crimes committed on the reservation. The Mashantucket Pequot Tribal Law and Order Code, enacted November 20, 1991, only nine days before the defendant was arrested, provides several examples. Section 1, entitled "Offenses against the Tribe," provides: "(a) *Violations of State criminal laws*: Every offense against those

criminal laws of the State of Connecticut *which are made applicable to the Mashantucket Pequot Reservation by section 6 of the Mashantucket Pequot Indian Claims Settlement Act, Pub. L. 98-134, 25 U.S.C. § 1755, and 25 U.S.C. § 1321,* shall be an offense against the law of the Mashantucket Pequot Tribe and the Mashantucket Pequot Tribe hereby adopts and incorporates by reference, as the law of the Mashantucket Pequot Tribe, all provisions of such criminal laws of the State of Connecticut *which are made applicable to the Mashantucket Pequot Reservation by Section 6 of the Mashantucket Pequot Indian Claims Settlement Act, Pub. L. 98-134, 25 U.S.C. § 1755, and 25 U.S.C. § 1321.*" (Emphasis added.) Mashantucket Pequot Tribal Ordinance No. 112091-01.

Section 5 of the Mashantucket Tribal Law and Order Code provides in relevant part: "*Concurrent jurisdiction over State offenses.* The Mashantucket Pequot Tribal Police Department shall exercise *concurrent* authority with law enforcement officers of the State of Connecticut to make arrests for violations of criminal laws of the State *which are made applicable to the Mashantucket Pequot Reservation by Section 6 of the Mashantucket Pequot Indian Claims Settlement Act, Pub. L. 98-134, 25 U.S.C. § 1755, and 25 U.S.C. § 1321*; provided, however, that persons arrested by officers of the Mashantucket Pequot Tribal Police Department for such violations of criminal laws of the State of Connecticut shall be transferred as promptly as may be feasible to the jurisdiction of the State law enforcement officers and the Mashantucket Pequot Tribal Police Department shall comply with all reasonable requirements of State law enforcement officers and agencies in order to assist in the prosecution of such offenders under the laws of the State of Connecticut." (Emphasis added.) Mashantucket Pequot Tribal Ordinance No. 112091-01.

These provisions not only reflect the tribe's acknowledgement that the state had acquired criminal jurisdiction over the reservation pursuant to § 1755, but also evince the tribe's apparent willingness to cooperate with the state's law enforcement authorities. Because we conclude that tribal consent to state jurisdiction was not required pursuant to § 1755, we need not consider whether these tribal ordinances act as subsequent ratification of state jurisdiction. They do, however, illustrate that the tribe understood the passage of § 1755 to confer criminal jurisdiction on the state.[9]

Finally, the Gaming Compact, ordered by the United States Secretary of the Interior as a result of the Indian Gaming Regulatory Act of 1988; see *Mashantucket Pequot Tribe* v. *Connecticut*, 737 F. Sup. 169 (D. Conn.), aff'd, 913 F.2d 1024 (2d Cir. 1990); 56 Fed. Reg. 24,996 (1991); provides that "[t]he State of Connecticut shall also have jurisdiction to enforce all other criminal laws of the State which are consistent with the provisions of this Compact on the Reservation, *including enforcement within the gaming facilities.*" (Emphasis added.) The compact assumes that the state had acquired criminal jurisdiction over the entire reservation and only emphasizes that the jurisdiction includes the gaming facilities. Additionally, the Mashantucket Pequot Gaming Commission stated: "The State Law Enforcement Agency (Connecticut State Police) *shall have jurisdiction to enforce all criminal laws on the reservation, including enforcement within the gaming facility.*" (Emphasis added.) Mashantucket Pequot Gaming Commission: Regulatory Responsibilities and Requirements of the Tribal Gaming Commission, State Gaming Agency and State Law Enforcement Agency (Novem-

---

[9] Indeed, from the time of the enactment of the Settlement Act in 1983, when the tribe gained federal recognition; see 25 U.S.C. § 1758; until 1990, the tribe had neither a police force nor a court system.

ber 14, 1991). The term "including" presupposes the existence of state jurisdiction over the entire reservation.

We conclude that the state of Connecticut acquired jurisdiction over crimes committed on the Mashantucket Pequot Indian Reservation by the enactment of § 1755 of title 25 of the United States Code.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.