## STATE OF CONNECTICUT *v.* MARK R. SEBASTIAN
## (SC 15434)

Callahan, C. J., and Borden, Berdon, Katz, Palmer, McDonald and Peters, Js.[1]

---

[1] This case originally was argued on December 5, 1996, before a panel of the court consisting of five justices. Thereafter, on April 10, 1997, this court decided, sua sponte, to reconsider the case en banc and ordered the parties and amici curiae to submit supplemental briefs on four additional issues. See footnote 14 of this opinion.

Argued May 27—officially released September 2, 1997

*William S. Bingham,* with whom was *Beth A. Hogan,* for the appellant (defendant).

*Kevin T. Kane,* state's attorney, with whom was *Sarah Steere,* deputy assistant state's attorney, for the appellee (state).

*Richard Blumenthal,* attorney general, and *David H. Wrinn* and *Susan Quinn Cobb,* assistant attorneys general, filed a brief for the attorney general as amicus curiae.

*Christopher F. Droney,* United States attorney, and *Carl J. Schuman,* assistant United States attorney, filed a brief for the United States of America as amicus curiae.

*Opinion*

PALMER, J. The dispositive issue raised by this appeal is whether the state of Connecticut has criminal jurisdiction over a defendant who is a member of an Indian tribe that has not been acknowledged by the federal government but whose application for acknowledgment is pending with the federal Bureau of Indian Affairs (BIA).[2] The defendant, Mark R. Sebastian, a member of the Paucatuck Eastern Pequot Tribe,[3] was

---

[2] Although this process is referred to both as "recognition" and "acknowledgment," we refer to the federal administrative or congressional recognition of a tribe's special relationship with the federal government as "acknowledgment." This term "more accurately reflect[s] the ethnohistorical reality of the United States' acknowledging the existence of an extant and continuously surviving American Indian polity"; W. Quinn, "Federal Acknowledgment of American Indian Tribes: Authority, Judicial Interposition, and 25 C.F.R. § 83," 17 Am. Indian L. Rev. 37, 37 n.4 (1992); and also more readily distinguishes the process of federal acknowledgment from the recognition that may be afforded a tribe under state law. See footnote 3 of this opinion.

Although Congress also can acknowledge a tribe by legislative act, the federal acknowledgment "function [generally] is carried out through an ordinary administrative process authorized by congressional statute. Congress has given the President the power to 'prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs.' [25 U.S.C. § 9.] Pursuant to these provisions, the President, through the Secretary of [the] Interior has promulgated rules to control the federal government's 'acknowledg[ment] that certain American Indian groups exist as tribes.' [25 C.F.R. § 83.2.] Federal acknowledgment 'is a prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes.' [Id.]" C. Ford, "Executive Prerogatives in Federal Indian Jurisprudence: The Constitutional Law of Tribal Recognition," 73 Denver U. L. Rev. 141 (1995). The federal statutes further provide that "[t]he Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." 25 U.S.C. § 2.

[3] Unless otherwise noted, we refer to the tribal entity to which the defendant has claimed to be a member as the Paucatuck Eastern Pequot Tribe,

charged with breach of the peace in violation of General Statutes § 53a-181,[4] for conduct stemming from an incident on tribal property in the town of North Stonington. After the trial court denied the defendant's motion to dismiss, which challenged the court's subject matter jurisdiction over his arrest and prosecution, the defendant entered a conditional plea of nolo contendere under General Statutes § 54-94a and Practice Book § 4003[5] to a substitute information charging him with

in keeping with the language of General Statutes §§ 47-59a, 47-59b and 47-63. Section 47-59a, in particular, provides: "Connecticut Indians; citizenship, civil rights, land rights. (a) It is hereby declared the policy of the state of Connecticut to recognize that all resident Indians of qualified Connecticut tribes are considered to be full citizens of the state and they are hereby granted all the rights and privileges afforded by law, that all of Connecticut's citizens enjoy. It is further recognized that said Indians have certain special rights to tribal lands as may have been set forth by treaty or other agreements.

"(b) The state of Connecticut further recognizes that the indigenous tribes, the Schaghticoke, the *Paucatuck Eastern Pequot*, the Mashantucket Pequot, the Mohegan and the Golden Hill Paugussett are self-governing entities possessing powers and duties over tribal members and reservations. Such powers and duties include the power to: (1) Determine tribal membership and residency on reservation land; (2) determine the tribal form of government; (3) regulate trade and commerce on the reservation; (4) make contracts; and (5) determine tribal leadership in accordance with tribal practice and usage." (Emphasis added.)

[4] General Statutes § 53a-181 provides: "(a) A person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or his property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which he is not licensed or privileged to do.

"(b) Breach of the peace is a class B misdemeanor."

[5] General Statutes § 54-94a provides: "Conditional nolo contendere plea. Appeal of denial of motion to suppress or dismiss. When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of

creating a public disturbance in violation of General Statutes § 53a-181a.[6] The trial court accepted the plea and rendered judgment thereon.[7] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. On June 30, 1993, the defendant was arrested by the Connecticut state police and charged with breach of the peace. The charge resulted from an altercation between the defendant and certain employees of the North Stonington highway department regarding the widening of a portion of Lantern Hill Road that passes through the Paucatuck Eastern Pequot reservation.[8] According to the state, the defendant was arrested after he had parked his automobile so as to block the grader that was being used by a road crew to widen the road, thereby obstructing the crew's activities and creating a hazard for other drivers. The defendant, who claims to be vice-chairman of the "Eastern Pequot Tribe" and

sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution." Practice Book § 4003 contains a substantially similar provision.

[6] General Statutes § 53a-181a provides: "Creating a public disturbance: Infraction. (a) A person is guilty of creating a public disturbance when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he (1) engages in fighting or in violent, tumultuous or threatening behavior; or (2) annoys or interferes with another person by offensive conduct; or (3) makes unreasonable noise.

"(b) Creating a public disturbance is an infraction."

[7] The trial court imposed a fine of $85 plus costs.

[8] Ashbow Sebastian, the defendant's brother, was also arrested for breach of the peace, but the charge against him was nolled. The defendant's brother is not a party to this appeal.

a resident of the Paucatuck Eastern Pequot reservation, has maintained that the town had no right to widen the road without tribal consent and, further, that he had given the road crew a cease and desist order in his official capacity as tribal vice-chairman.[9]

On December 13, 1993, the defendant moved to dismiss the charge, claiming, inter alia, that: (1) the state's assumption of criminal jurisdiction was preempted by operation of federal law; and (2) the state court's exercise of jurisdiction over him unduly infringed on tribal sovereignty because he had been acting as a tribal officer in furtherance of legitimate tribal interests. On November 18, 1994, the trial court, after a hearing, orally denied the motion to dismiss. On January 31, 1995, the trial court issued a written memorandum of decision explaining the grounds for its denial of the defendant's motion, concluding that "where [the defendant] ha[s] not established that [he is an Indian], or that the offense took place on a reservation, there is no basis for granting the motion to dismiss."

The trial court thereafter granted the defendant's motion for reargument and, on April 28, 1995, the court conducted a hearing on that motion.[10] For purposes of the hearing, the state and the defendant entered into the following stipulation: "(1) The land on which the alleged infraction took place is the Eastern Pequot also known as the Paucatuck Eastern Pequot Reservation.

---

[9] The dissent mischaracterizes the defendant's recitation of the facts as undisputed. In fact, the state never conceded that the defendant's version of the facts was accurate, the trial court never made the factual findings upon which the dissent relies, and the defendant never specifically requested that the trial court articulate its factual findings regarding his alleged position as vice-chairman of the "Eastern Pequot Tribe," his alleged residence on the Paucatuck Eastern Pequot reservation, his alleged previous interactions with the North Stonington town officials, or his alleged basis for committing the infraction at issue on appeal. See footnote 13 of this opinion.

[10] Previously, on March 31, 1995, the state had filed a substitute information charging the defendant with creating a public disturbance.

(2) The Eastern Pequot Tribe, also known as the Pauca-tuck Eastern Pequot Tribe, is recognized by the State of Connecticut as one of the five indigenous Indian Tribes in the State of Connecticut.[11] (3) This Tribe has not been . . . federally [acknowledged as a] Tribe pur-suant to 25 Code of Federal Regulations Part 83 although an application for such [acknowledgment] was filed in 1989 and is in active consideration status with the [BIA]." The trial court, upon reconsideration of the defendant's motion to dismiss, reaffirmed its earlier ruling on that motion. The defendant thereafter entered a plea of nolo contendere to the charge of creating a public disturbance, conditioned upon his right to appeal the court's determination that the state had criminal jurisdiction over him.

On October 30, 1995, the defendant filed a motion for articulation, which was granted by the trial court. In its articulation, the trial court stated that the defen-dant had presented sufficient evidence to establish that he was a member of the Paucatuck Eastern Pequot Tribe[12] and, consequently, that he was an "Indian" for

---

[11] General Statutes § 47-63 provides: "Definitions. The following terms as used in this chapter, shall have the following meanings: 'Indian' means a person who is a member of any of the following tribes, *Paucatuck Eastern Pequot*, Mashantucket Pequot, Schaghticoke, Golden Hill Paugussett and Mohegan; 'reservation' means the Paucatuck Eastern Pequot reservation in the town of North Stonington, assigned to the use of the Paucatuck Eastern Pequot tribe; the Golden Hill Paugussett reservations in the towns of Trum-bull and Colchester, assigned to the Golden Hill Paugussett tribe; the Schaghticoke reservation in the town of Kent, assigned to the Schaghticoke tribe, and the Mashantucket Pequot reservation in the town of Ledyard, assigned to the Mashantucket Pequot tribe; 'tribal funds' means the money held by the state for the use and benefit of a tribe as distinguished from legislative appropriations." (Emphasis added.)

[12] The trial court noted its reluctance to consider the issue of tribal mem-bership in light of General Statutes § 47-66j (b), which provides: "A member-ship dispute shall be resolved in accordance with tribal usage and practice. Upon request of a party to a dispute, the dispute may be settled by a council. Each party to the dispute shall appoint a member of the council and the parties shall jointly appoint one or two additional members provided the number of members of the council shall be an odd number. If the parties

purposes of state law. The trial court further stated that "[a]ll of the defendant's arguments are without merit since he has failed to show any federal [acknowledgment] of the tribe or its reservation. The only evidence before the court indicates that the Paucatuck Eastern Pequot Tribe is an entity recognized solely by the [s]tate of Connecticut which has criminal jurisdiction in this matter."[13]

On appeal, the defendant reasserts the federal preemption and tribal sovereignty claims that he advanced

cannot agree on any joint appointment, the Governor shall appoint such member who shall be a person knowledgeable in Indian affairs. The decision of the council shall be final on substantive issues but an appeal may be taken to the Superior Court to determine if membership rules filed in the office of the Secretary of the State pursuant to this section have been followed. If the court finds that the dispute was not resolved in accordance with the provisions of the written description, it shall remand the matter with instructions to reinstitute proceedings, in accordance with such provisions."

With regard to the issue of tribal membership, the trial court stated: "I want to make it perfectly clear [that] I will accept any evidence to prove that these gentlemen are members of a tribe. I am precluded from [making that determination] by state law. Tribal determination has to be made by the tribe. If the tribe makes that determination and evidence of that is introduced, then . . . I would accept that and take judicial notice of it. It would be conclusive." On the basis of testimony elicited by the defendant from William Bingham, attorney for the "Eastern Pequot Tribe" and director of that group's federal acknowledgment project, as well as the defendant's counsel on appeal, the trial court concluded that the defendant had established that he is enrolled in the tribe as a member. No claim has been raised by either party challenging this determination.

[13] As we previously have noted, the defendant claims to be vice-chairman of the "Eastern Pequot Tribe" and a resident of the Paucatuck Eastern Pequot reservation. Although the trial court concluded that the defendant was a member of the Paucatuck Eastern Pequot Tribe; see footnote 12 of this opinion; it made no findings as to the defendant's residency or his alleged leadership position within the tribe. The attorney general of the state of Connecticut, who filed an amicus brief in this case, argues that the state recognizes only the "Paucatuck Eastern Pequot Tribe," and not the "Eastern Pequot Tribe," of which the defendant alleges he is a member. The attorney general further notes, and the defendant does not dispute, that separate petitions for federal acknowledgment have been filed with the BIA by groups calling themselves the "Paucatuck Eastern Pequot Tribe" and the "Eastern Pequot Tribe." Moreover, the state's attorney noted in the trial

in support of his motion to dismiss.[14] Because we agree with the trial court that the state has criminal jurisdiction over the defendant, we affirm the judgment of the trial court.

## I

## JURISDICTIONAL OVERVIEW

Article first, § 8, of the United States constitution provides in relevant part that "[t]he Congress shall have

court that "there has been and continues to be a long-standing dispute between two distinct factions as to tribal membership and leadership," and, further, "that there has been a conflict as to who [are] the alleged members or leaders of the Eastern Paucatuck Tribe."

The stipulation upon which the trial court relied, however, refers to the "Eastern Pequot Tribe" as the same entity as the "Paucatuck Eastern Pequot Tribe," which is recognized by the state. The Appellate Court, moreover, has referred to the "Eastern Pequot[s]" as a "faction of the [Paucatuck Eastern Pequot] tribe, the members of which claim to be the true tribal members." *Paucatuck Eastern Pequot Indians* v. *Connecticut Indian Affairs Counsel*, 18 Conn. App. 4, 6 n.3, 555 A.2d 1003 (1989). Accordingly, for purposes of this appeal, we accept the trial court's conclusion that the defendant is a member of a tribe recognized by the state of Connecticut. See *Hunte* v. *Blumenthal*, 238 Conn. 146, 150, 680 A.2d 1231 (1996) (stipulation relied upon by trial court also informs issues on appeal).

[14] The defendant, the state and the amici curiae also have briefed the following four additional issues that we asked them to address in our order for reargument in this case: (1) "What bearing, if any, does the definition of the term 'Indian' contained in 25 U.S.C. § 1301 (4) have on the issue of whether the defendant is an 'Indian' for purposes of criminal jurisdiction? Does a different definition of 'Indian' apply under 25 U.S.C. § 1321 as opposed to under either the Indian Major Crimes Act, 18 U.S.C. § 1153, or the Indian Country Crimes Act, 18 U.S.C. § 1152 (incorporating the Assimilative Crimes Act, 18 U.S.C. § 13)?" (2) "In *LaPier* v. *McCormick*, 986 F.2d 303 (9th Cir. 1993), the court concluded that, for purposes of 25 U.S.C. § 1321, the term 'Indian' includes only those persons who are members of a tribe that has been formally acknowledged by the [BIA]. Is that holding still viable in light of 25 U.S.C. § 1301 (4)? If so, what specific authority is there to support the *LaPier* court's conclusion that the BIA has *exclusive* jurisdiction to determine whether a person is an 'Indian' for purposes of criminal jurisdiction? Finally, what impact does the decision of the Court of Appeals for the Second Circuit in *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51 (2d Cir. 1994), regarding the BIA's *primary* jurisdiction over the federal acknowledgment determination, have on this issue?" (3) "Assuming that it is necessary for the trial court to reach the question of whether the

Power . . . [t]o regulate Commerce . . . with the
Indian Tribes . . . ." Thus, criminal offenses commit-
ted by or against members of such "Indian Tribes" in
"Indian country"; see footnote 22 of this opinion; "ordi-
narily have been subject only to federal or tribal laws
. . . except where Congress in the exercise of its ple-
nary and exclusive power over Indian affairs has
expressly provided that [s]tate laws shall apply. . . ."
(Citations omitted; internal quotation marks omitted.)
*State* v. *Spears*, 234 Conn. 78, 84–85, 662 A.2d 80, cert.
denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490
(1995); see also *Washington* v. *Yakima Indian Nation*,
439 U.S. 463, 470–71, 99 S. Ct. 740, 58 L. Ed. 2d 740
(1979). Accordingly, the jurisdictional claims raised by
the defendant "[implicate] two separate principles. The
first is the extent to which Congress has preempted the
field by exercising direct control over the [Paucatuck
Eastern Pequot] Indians pursuant to its powers set out
in [article first, § 8, of the] federal constitution, and the
second is the extent to which the [Paucatuck Eastern
Pequot] Indians have retained a residual and demonstra-
ble tribal sovereignty as [acknowledged] by federal case
law. *White Mountain Apache Tribe* v. *Bracker*, 448 U.S.
136, 144, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980).

"This congressional authority . . . and the semi-
independent position of Indian tribes have given rise
to two independent but related barriers to the assertion

conduct underlying the defendant's plea of nolo contendere to creating a
public disturbance took place in 'Indian country,' should we depart from
the test that we established in *Schaghticoke Indians of Kent, Connecticut,
Inc.* v. *Potter*, 217 Conn. 612, 587 A.2d 139 (1991), for determining whether
land is 'Indian country?' If so, what test should we adopt?" and (4) "If the
trial court ultimately were to determine that the defendant is 'Indian' by
virtue of his tribal affiliation, and that the Paucatuck Eastern Pequot reserva-
tion is 'Indian country' for criminal jurisdiction purposes, would either the
federal or tribal courts lack jurisdiction over any other crimes, violations, or
infractions committed by members of the defendant's tribe on the Paucatuck
Eastern Pequot reservation?" (Emphasis in original.)

of state . . . authority over tribal reservations and members. First, the exercise of such authority may be [preempted] by federal law. . . . Second, [the state action] may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them. . . . The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. [Id.], 142–43." (Citations omitted; internal quotation marks omitted.) *Schaghticoke Indians of Kent, Connecticut, Inc.* v. *Potter*, 217 Conn. 612, 617–18, 587 A.2d 139 (1991) (hereinafter *Schaghticoke*). Because the defendant would prevail on his claim that the state lacks the authority to prosecute him if he could establish either of these jurisdictional claims, we address each in turn.

## II

### FEDERAL PREEMPTION

The defendant advances two reasons why the trial court should have dismissed the criminal charge against him on federal preemption grounds. First, he claims that the provisions of the Indian Civil Rights Act of 1968[15] that set forth the process by which a state may assume jurisdiction over criminal offenses by or against "Indians" in "Indian country"; see 25 U.S.C. §§ 1321 (a), 1326;[16] are

---

[15] The Indian Civil Rights Act is codified at 25 U.S.C. §§ 1301 through 1341.

[16] Title 25, § 1321, of the United States Code provides in relevant part: "Assumption by State of criminal jurisdiction

"(a) Consent of United States; force and effect of criminal laws

"The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the area of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State. . . ."

applicable to him because he is an "Indian" within the meaning of the Indian Civil Rights Act and because his alleged infraction was committed in "Indian country" as that term is used in this act. The defendant further claims that, because the state has never satisfied the requirements for assuming criminal jurisdiction under the Indian Civil Rights Act with respect to the Paucatuck Eastern Pequot Tribe, the state lacks jurisdiction to prosecute him. Second, the defendant contends that, even if we were to conclude that the Indian Civil Rights Act does not apply to preempt his state criminal prosecution, it nevertheless is barred under the facts of this case by the Indian Trade and Intercourse Act of 1790 (Nonintercourse Act),[17] 25 U.S.C. § 1322 (b),[18] and 25

Title 25, § 1326, of the United States Code provides in relevant part: "State jurisdiction acquired pursuant to this [title] . . . with respect to criminal offenses . . . shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. . . ."

[17] The Nonintercourse Act, now codified at 25 U.S.C. § 177, provides: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty."

[18] Title 25, § 1322 (b), of the United States Code provides: "Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudi-

C.F.R. § 1.4.[19] We disagree with both of the defendant's claims.

## A

## Indian Civil Rights Act

The state concedes that it has never formally obtained criminal jurisdiction over the Paucatuck Eastern Pequot Tribe under the relevant provisions of the Indian Civil Rights Act. In light of this concession, the defendant maintains that the state's exercise of criminal jurisdiction over him for his conduct on tribal property was preempted by federal law. The state, on the other hand, contends that its exercise of criminal jurisdiction over the defendant is not dependent on its compliance with the requirements of 25 U.S.C. § 1321 (a); see footnote 16 of this opinion; because the defendant is not an Indian within the meaning of that statutory provision. In support of its claim, the state asserts that, because the defendant concededly is not a member of a tribe that has been acknowledged by the federal government, he is not an Indian for purposes of criminal jurisdiction under the Indian Civil Rights Act.[20] We agree with the state.

cate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

[19] Title 25, § 1.4, of the Code of Federal Regulations (1997) provides in relevant part: "[N]one of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States."

[20] The state also maintains that the Paucatuck Eastern Pequot reservation is not Indian country within the meaning 25 U.S.C. § 1321 (a) and, therefore, that the defendant also has failed to meet the second requirement of that statutory provision. See footnote 16 of this opinion. Because we conclude that the defendant is not an Indian within the meaning of 25 U.S.C. § 1321 (a), we need not consider whether the Paucatuck Eastern Pequot reservation is Indian country for purposes of criminal jurisdiction under the Indian Civil Rights Act. Accordingly, we decline the state's invitation to reconsider the

Section 1321 (a) sets forth the requirements that a state must satisfy in order to acquire criminal jurisdiction over particular Indian tribes and lands. It provides that "[t]he consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against *Indians* in the areas of *Indian country* situated within such State to assume, with the consent of the *Indian* tribe occupying the particular *Indian country* or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such *Indian country* or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such *Indian country* or part thereof as they have elsewhere within that State." (Emphasis added.)

In general, federal courts have held that states have subject matter jurisdiction over crimes committed in Indian country that do not involve Indians.[21] See, e.g.,

test enunciated in *Schaghticoke*, supra, 217 Conn. 617–18, for determining whether certain Indian property constitutes a "dependent Indian community."

[21] Conversely, "Congress has conferred on the federal courts special criminal jurisdiction over offenses [involving Indians] committed in Indian country. See *Negonsott* v. *Samuels*, 507 U.S. 99, 102–103, 113 S. Ct. 1119, 122 L. Ed. 2d 457 (1993). The Indian Country Crimes Act, codified at 18 U.S.C. § 1152, applies to crimes committed by non-Indians against Indians and to crimes committed by Indians against non-Indians not encompassed by other statutes or prosecuted in a tribal court. See *Williams* v. *United States*, 327 U.S. 711, 714, 66 S. Ct. 778, 90 L. Ed. 962 (1946); F. Cohen, Handbook of Federal Indian Law (1982 Ed.) pp. 287–300. The Indian Major Crimes Act establishes as federal crimes certain felonies committed by any Indian in Indian country 'against the person or property of another Indian or other person . . . .' 18 U.S.C. §§ 1153, 3242. In the absence of an express grant of state jurisdiction by Congress, state jurisdiction within Indian country 'is limited to crimes by non-Indians against non-Indians . . . and victimless crimes by non-Indians.' *Solem* v. *Bartlett*, 465 U.S. 463, 465 n.2, 104 S. Ct. 1161, 79 L. Ed. 2d 443, reh. denied, 466 U.S. 948, 104 S. Ct. 2148, 80 L. Ed. 2d 535 (1984)." *State* v. *Spears*, supra, 234 Conn. 85 n.6.

*Brown* v. *Burns*, 996 F.2d 219, 220 (9th Cir. 1993) (offense occurring outside Indian country subject to state jurisdiction); *LaPier* v. *McCormick*, 986 F.2d 303, 305–306 (9th Cir. 1993) (state has jurisdiction over defendant claiming enrollment in tribe that is not federally acknowledged because defendant therefore is not Indian); *United States* v. *Heath*, 509 F.2d 16, 19 (9th Cir. 1974) (defendant who is member of tribe whose federal trust relationship has been terminated is not Indian under Indian Major Crimes Act, 18 U.S.C. § 1153); *St. Cloud* v. *United States*, 702 F. Sup. 1456, 1465 (D.S.D. 1988) (state has jurisdiction over defendant who is member of tribe whose federal trust relationship has been terminated); see also *United States* v. *Antelope*, 430 U.S. 641, 646 n.7, 97 S. Ct. 1395, 51 L. Ed. 2d 701 (1977) ("as enrolled tribal members, respondents were subjected to federal jurisdiction only because their crimes were committed within the confines of Indian country"); see generally Conference of Western Attorneys General, American Indian Law Deskbook (1993) pp. 86–97. Although the term Indian country is defined in 18 U.S.C. § 1151,[22] the term Indian is not statutorily defined. The defendant originally claimed that he was an Indian for purposes of the Indian Civil Rights Act because he belongs to a "bona fide tribe" that has been recognized by the state and that has inhabited its reservation as a tribe continuously since 1790.[23] On reargument, however, the defendant conceded, and the state

[22] Title 18, § 1151, of the United States Code provides in relevant part: " 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and (c) all Indian allotments . . . ." This jurisdictional definition is applicable in both criminal and civil contexts. See, e.g., *California* v. *Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S. Ct. 1083, 94 L. Ed. 2d 244 (1987).

[23] In claiming that the term Indian in the Indian Civil Rights Act includes a member of a "bona fide tribe," the defendant relied on our decision in *Schaghticoke,* supra, 217 Conn. 612, as well as that of the Supreme Court of Maine in *State* v. *Dana,* 404 A.2d 551 (Me. 1979), cert. denied, 444 U.S.

and the amici curiae agree, that the term Indian under the Indian Civil Rights Act has the same meaning as Indian under the Indian Country Crimes Act, 18 U.S.C. § 1152,[24] and the Indian Major Crimes Act, 18 U.S.C. § 1153.[25] We are persuaded that the proper definition

1098, 100 S. Ct. 1064, 62 L. Ed. 2d 785 (1980). Following the definition adopted in *Dana*, we stated that a "dependent Indian community," one of the three types of Indian country, is present where "(1) there is a *bona fide tribe of Indians*, and (2) the tribe has inhabited the land, has had 'Indian title' to it since 1790, and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose." (Emphasis added.) *Schaghticoke*, supra, 620. Although *Dana* involved the application of this test in the criminal context, we expressly stated that our decision in *Schaghticoke* "*in no way addresse[d]* the very different questions of whether the state retains criminal jurisdiction over actions occurring on an Indian reservation . . . ." (Emphasis added.) Id., 615 n.3. We reiterate that distinction today.

[24] Title 18, § 1152, of the United States Code provides: "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

[25] Title 18, § 1153, of the United States Code provides: "Offenses committed within Indian country

"(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

"(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense."

of Indian for purposes of the Indian Civil Rights Act is the definition of Indian developed in the federal cases construing §§ 1152 and 1153.

Following the suggestion of the United States Supreme Court in *United States* v. *Rogers*, 45 U.S. (4 How.) 567, 572–73, 11 L. Ed. 1105 (1846), federal courts consider a criminal defendant to be an Indian under these statutes if he or she (1) has some Indian blood,[26] *and* (2) is recognized as an Indian by a tribe[27] or by the federal government. See, e.g., *Scrivner* v. *Tansy*, 68 F.3d 1234, 1241 (10th Cir. 1995), cert. denied, 516 U.S. 1178, 116 S. Ct. 1277, 134 L. Ed. 2d 223 (1996); *United States* v. *Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995); *United States* v. *Torres*, 733 F.2d 449, 456 (7th Cir.), cert. denied, 469 U.S. 864, 105 S. Ct. 204, 83 L. Ed. 2d 135 (1984); *United States* v. *Broncheau*, 597 F.2d 1260, 1263 (9th Cir.), cert. denied, 444 U.S. 859, 100 S. Ct. 123, 62 L. Ed. 2d 80 (1979); *United States* v. *Driver*, 755 F. Sup. 885, 888–89 (D.S.D.), aff'd, 945 F.2d 1410 (8th Cir. 1991), cert. denied, 502 U.S. 1109, 112 S. Ct. 1209,

---

[26] Although the state indicated at oral argument that the test did not contain a racial component, it cited no cases to support that assertion, and the cases that we have reviewed indicate otherwise.

[27] In general, the federal case law either refers to a federally acknowledged tribe by name or makes reference to a tribe being "official." Contrary to the view espoused by the defendant, we are aware of no federal authority to support a claim that state recognition of a tribe has any bearing on federal criminal jurisdiction over that tribe. State recognized tribes, which are found primarily in the eastern United States, generally "are tribes [that] very early in their interaction with whites came under the protection and jurisdiction of the colonial, and later, state governments. In general, it is the state government which has the responsibility for providing services and benefits and for exercising primary civil and criminal jurisdiction over the tribes." S. O'Brien, "Tribes and Indians: With Whom Does the United States Maintain a Relationship?," 66 Notre Dame L. Rev. 1461, 1476 (1991). Two tribes recognized by the state of Connecticut, however, have been granted federal acknowledgment by congressional enactment. See 25 U.S.C. § 1758 (a) (Mashantucket Pequot Tribe); 25 U.S.C. § 1775 (a) (1) (Mohegan Tribe of Indians of Connecticut). We note that Congress also has transferred criminal jurisdiction over these two tribes to the state. 25 U.S.C. §§ 1755, 1775d.

117 L. Ed. 2d 448 (1992); *St. Cloud* v. *United States*, supra, 702 F. Sup. 1460–61; see also *United States* v. *Antelope*, supra, 430 U.S. 646–67 n.7; *United States* v. *Dodge*, 538 F.2d 770, 786–87 (8th Cir. 1976), cert. denied, 429 U.S. 1099, 97 S. Ct. 1118, 51 L. Ed. 2d 547 (1977); *United States* v. *Lossiah*, 537 F.2d 1250, 1251 (4th Cir. 1976).

Generally, the first, so-called "racial" prong of this test must be met as well as the second, nonracial prong. Courts have considered the following enumerated factors, in declining order of importance, in determining whether a defendant meets the second, nonracial prong of this test: "(1) enrollment in a tribe; (2) government recognition formally and informally through providing the person assistance reserved only to Indians; (3) enjoying benefits of tribal affiliation; and (4) social recognition as an Indian through living on a reservation and participating in Indian social life." *St. Cloud* v. *United States*, supra, 702 F. Sup. 1461; see also *United States* v. *Torres*, supra, 733 F.2d 456; *United States* v. *Driver*, supra, 755 F. Sup. 888; see generally S. Rep. No. 102-153, pp. 50–51, reprinted in United States Congressional Serial Set, Serial No. 14049, Senate Reports Nos. 151–67, 102d Cong., 1st Sess. (1991) (Appendix C, prepared by American Law Division of Library of Congress Research Division for Senate Select Committee on Indian Affairs, discussing federal case law under 18 U.S.C. §§ 1151 through 1153).

The four factors enumerated in *St. Cloud* have emerged as a widely accepted test for Indian status in the federal courts. Thus, a person with sufficient Indian ancestry who also is a member of a federally acknowledged Indian tribe generally will be subject only to federal criminal jurisdiction if he commits an offense in Indian country.[28] See, e.g., *United States* v. *Torres*,

---

[28] Although there has been no single, standardized definition of Indian encompassing all federal criminal statutes; see R. Clinton, "Criminal Jurisdic-

supra, 733 F.2d 455 (defendants each had sufficient Menominee Indian blood and enrolled in federally acknowledged Menominee Indian Tribe); *United States* v. *Dodge*, supra, 538 F.2d 786–87 (defendants each had one-fourth Indian blood and enrolled in federally acknowledged Yurok Tribe and Pawnee Tribe, respectively); *United States* v. *Lossiah*, supra, 537 F.2d 1251 (defendant enrolled in federally acknowledged Eastern Band of Cherokee Indians and had three-fourths Eastern Cherokee blood); see also *United States* v. *Antelope*, supra, 430 U.S. 646–47 n.7 (noting that § 1153 does not apply to many individuals who are racially Indian, but that government had proved that defendants were "enrolled members of [federally acknowledged] Coeur d'Alene Indian Tribe and thus not emancipated from tribal relations"). The other three factors enumerated in *St. Cloud* often are considered by federal courts when

tion Over Indian Lands: A Journey Through a Jurisdictional Maze," 18 Ariz. L. Rev. 503, 513–20 (1976); most recent federal cases consider whether the tribe to which a defendant or victim claims membership or affiliation has been acknowledged by the federal government. See, e.g., *United States* v. *Antelope*, supra, 430 U.S. 647 n.7 (noting that affiliation with, as opposed to actual enrollment in, "an *official* tribe" may be sufficient in some cases under Indian Major Crimes Act [emphasis added]); *Scrivner* v. *Tansy*, supra, 68 F.3d 1241 (citing *Antelope* for proposition that "§ 1153 federal criminal jurisdiction applies to enrolled members of tribes whose *official* status has not been terminated by congressional enactment and who committed crimes within the confines of Indian country" [emphasis added]); *United States* v. *Torres*, supra, 733 F.2d 453 n.1 ("[two defendants] were prosecuted under Federal statutes due to their enrollment in the [federally acknowledged] Menominee Indian Tribe and the fact that the alleged murder occurred on a Federal Indian Reservation"); *United States* v. *Broncheau*, supra, 597 F.2d 1262 (defendant enrolled in federally acknowledged Nez Perce Tribe and committed his offense within boundaries of Nez Perce Indian reservation); *United States* v. *Lossiah*, supra, 537 F.2d 1251 (defendant enrolled in federally acknowledged Eastern Band of Cherokee Indians and committed offense within Cherokee Indian reservation); *United States* v. *Driver*, supra, 755 F. Sup. 888–89 (although defendant had sufficient Indian blood, defendant not member of, or sufficiently affiliated with, federally acknowledged Oglala Sioux Tribe); see generally 44 Fed. Reg. 7235 (1979) (first published BIA list of "Indian tribal entities that have a government-to-government relationship with the United States").

a defendant claims Indian status based on his or her affiliation with, as opposed to membership in, a federally acknowledged tribe. See, e.g., *St. Cloud* v. *United States*, supra, 702 F. Sup. 1461; see also *United States* v. *Torres*, supra, 455–56; *United States* v. *Driver*, supra, 755 F. Sup. 888–89; S. Rep. No. 102-153, supra, pp. 50–51.

Our research has revealed only one federal case, *LaPier* v. *McCormick*, supra, 986 F.2d 303, that has addressed the very question posed by this appeal, namely, whether a state court may exercise criminal jurisdiction over an Indian who is a member of a tribe that has not been acknowledged by the executive or legislative branches of the federal government.[29] In *LaPier*, the petitioner, Leland Neal LaPier, had been convicted in Montana state court[30] of aggravated burglary, aggravated kidnapping and felonious assault committed within the boundaries of a federal Indian reservation. He appealed the denial of his petition for a writ of habeas corpus to the Court of Appeals for the Ninth Circuit, claiming that the state court had lacked subject matter jurisdiction over his criminal prosecution because he was an Indian who could be tried criminally only in federal court under the terms of the Indian

---

[29] The defendant has identified no state case, and we are aware of none, that addresses the exact question raised by this appeal.

[30] The state of Montana had not been granted, nor had it assumed, criminal jurisdiction under the Indian Civil Rights Act over the Blackfeet Indian reservation, the location of LaPier's criminal activity. See *LaPier* v. *McCormick*, supra, 986 F.2d 304 n.2. Because there was no question that the Blackfeet Indian reservation was Indian country, the sole question before the Court of Appeals for the Ninth Circuit was whether LaPier, who claimed to be enrolled in the Little Shell Band of Landless Chippewa Indians of Montana, was an Indian for purposes of federal criminal jurisdiction under the Indian Civil Rights Act even though his tribe had not received federal acknowledgment. The Little Shell Band of Landless Chippewa Indians of Montana, like the Paucatuck Eastern Pequot Tribe, had an application for federal acknowledgment that was pending with the BIA at the time that *LaPier* was decided. Id., 306; *State* v. *LaPier*, 242 Mont. 335, 341, 790 P.2d 983 (1990). On appeal, LaPier had abandoned his claim that he was affiliated with two federally acknowledged tribes, the Blackfeet Tribe and the Turtle Mountain Band of Chippewas. *LaPier* v. *McCormick*, supra, 306 n.5.

Civil Rights Act. Because there was no dispute that the area in which his crimes were committed was Indian country, the sole issue faced by the Ninth Circuit was whether LaPier was an Indian for purposes of criminal jurisdiction.

In rejecting LaPier's claim, the Ninth Circuit noted that "criminal jurisdiction [in Indian country] is allocated among federal, state, and tribal courts depending on the subject matter of the crime, the persons involved in the crime, and the locus of the crime . . . . Because the crime occurred on an Indian reservation, LaPier's legal status as an Indian (or non-Indian) determines jurisdiction. If LaPier is legally an Indian, the federal court would have jurisdiction, 18 U.S.C. § 1153 (1988), but if he is not, [then] the . . . state courts would have exclusive jurisdiction, because the victim was a non-Indian.[31] *United States* v. *McBratney*, 104 U.S. 621, 26 L. Ed. 869 (1882); see also *United States* v. *Wheeler*, 435 U.S. 313, 325 n.21, 98 S. Ct. 1079, 1087 n.21, 55 L. Ed. 2d 303 (1978).

"LaPier has steadfastly maintained that, as an Indian, he should have been tried in federal court. Generally speaking, it is true that in Indian country federal jurisdiction is preeminent, specifically covering interracial crimes committed on an Indian reservation, [fourteen] major crimes if committed by an Indian on a reservation, and certain assimilative crimes within Indian country. [R.] Clinton, 'Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze,' 18

---

[31] In the present case, in contrast, the defendant's infraction was a "victimless" crime in the sense that no victim was involved whose status as an Indian also would have to be considered by the trial court. A non-Indian who commits a victimless crime in Indian country, however, also is subject to state jurisdiction. *Solem* v. *Bartlett*, 465 U.S. 463, 465 n.2, 104 S. Ct. 1161, 79 L. Ed. 2d 443 (1984) ("[w]ithin Indian country, state jurisdiction is limited to crimes by non-Indians against non-Indians . . . and victimless crimes by non-Indians" [citation omitted]); see generally Conference of Western Attorneys General, supra, pp. 86–97.

Ariz. L. Rev. 503, 575–76 (1976). The boundaries of this federal jurisdiction, however, are not as clearly defined as one might hope or expect. Among other things, the ambiguous definitions currently used for determining who is an Indian, [id., 576], complicate what should be rather routine analysis.

"We need not address, however, the question whether LaPier has shown a significant degree of blood and sufficient connection to his tribe to be regarded as one of its members for criminal jurisdiction purposes. See, e.g., *United States* v. *Rogers*, [supra, 45 U.S. (4 How.) 573]; *United States* v. *Broncheau*, [supra, 597 F.2d 1263]. There is a simpler threshold question that must be answered first, and in this case it is dispositive: Is the Indian group with which LaPier claims affiliation a federally acknowledged Indian tribe?

"If the answer is no, the inquiry ends. A defendant whose only claim of membership or affiliation[32] is with an Indian group that is not a federally acknowledged Indian tribe cannot be an Indian for criminal jurisdiction purposes. Cf. *United States* v. *Heath*, [supra, 509 F.2d 19] (member of terminated Indian tribe no longer Indian for criminal jurisdiction purposes). This is because in

---

[32] Several older federal cases have indicated that actual membership in an "official" tribe is not necessary if a defendant's relationship with such a tribe is akin to that of a member. See *United States* v. *Ives*, 504 F.2d 935, 953 (9th Cir. 1974), vacated on other grounds, 421 U.S. 944, 95 S. Ct. 1671, 44 L. Ed. 2d 97 (1975); *Ex parte Pero*, 99 F.2d 28, 30 (7th Cir. 1938), cert. denied, 306 U.S. 643, 59 S. Ct. 581, 83 L. Ed. 1043 (1939). The defendant in this case represented to the trial court that he is of mixed Indian ancestry, which includes Mashantucket Pequot ancestry. The Mashantucket Pequot Tribe is recognized by the state of Connecticut; General Statutes § 47-63; and also has been acknowledged by the federal government. When the trial court suggested that it would be willing to consider the defendant's Mashantucket Pequot ancestry instead of his Paucatuck Eastern Pequot background, the defendant declined to present evidence regarding that affiliation. Accordingly, the question of whether the defendant's affiliation with the Mashantucket Pequot Tribe would satisfy the test for Indian status under the Indian Civil Rights Act is not before us.

dealing with Indians the Federal Government is dealing primarily not with a particular race as such but with members of certain social-political groups towards which the Federal Government has assumed special responsibilities. Id. (quoting Felix Cohen, [supra, (1942) p. 5]). Federal legislation treating Indians distinctively is rooted in the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a guardian-ward status, to legislate on behalf of federally [acknowledged] Indian tribes. *Morton* v. *Mancari*, 417 U.S. 535, 551, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974). Thus, the special federal role in regulating the tribes as a separate people with their own political institutions is the foundation for federal criminal jurisdiction over Indians in Indian country. *United States* v. *Antelope*, [supra, 430 U.S. 646].

"It is therefore the existence of the special relationship between the federal government and the tribe in question that determines whether to subject the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country. See [id., 646–47 n.7]; [*United States* v. *Heath*, supra, 509 F.2d 19]. To determine whether that special relationship exists—whether the United States [acknowledges] a particular tribe—we defer to the political departments. See *Baker* v. *Carr*, 369 U.S. 186, 215, 82 S. Ct. 691, 709, 7 L. Ed. 2d 663 (1962)." (Citations omitted; internal quotation marks omitted.) *LaPier* v. *McCormick*, supra, 986 F.2d 304–305. The Ninth Circuit then reviewed the list compiled by the BIA of tribes that had received federal acknowledgment.[33] Because the tribe to which

_____

[33] The BIA list is comprehensive because it enumerates "exactly which Indian tribes are federally acknowledged and by exclusion from that list which Indian groups are not." W. Quinn, "Federal Acknowledgment of American Indian Tribes: Authority, Judicial Interposition, and 25 C.F.R. § 83," 17 Am. Indian L. Rev. 37, 38 (1992). "Two methods [currently] exist by which an unacknowledged Indian group can obtain federal acknowledgment as a

LaPier claimed membership was not on this list,[34] the court concluded that there was no "special relationship" between LaPier's tribe and the federal government. Id., 305, citing W. Quinn, "Federal Acknowledgment of American Indian Tribes: Authority, Judicial Interposition, and 25 C.F.R. § 83," 17 Am. Indian L. Rev. 37, 38 (1992). Consequently, LaPier was deemed not to be an Indian for purposes of federal criminal jurisdiction.[35]

In general, we look to the federal courts for guidance in resolving issues of federal law. See, e.g., *Joo* v. *Capitol Switch, Inc.*, 231 Conn. 328, 332–36, 650 A.2d 526 (1994)

tribe: secretarial and congressional." Id., 55. Under the secretarial method, a group may acquire federally acknowledged status by petitioning the BIA under the relevant regulations; the congressional method, however, involves the passage of specific legislation on behalf of the tribe. Id., 45–53. The BIA list includes not only those tribes that have been acknowledged under the BIA administrative process or federal statute, but also tribes that were acknowledged by other methods, such as a treaty relationship between the tribe and the federal government. Id., 38–40; see, e.g., 44 Fed. Reg. 7235 (1979) (first published BIA list of "Indian tribal entities that have a government-to-government relationship with the United States"); see also 60 Fed. Reg. 9250 (1995) (BIA list last published before trial court rendered decision).

[34] The court also noted that LaPier had made no claim that the BIA list of federally acknowledged tribes was incomplete. *LaPier* v. *McCormick*, supra, 986 F.2d 305.

[35] The Ninth Circuit stressed that it had made no determination as to the defendant's Indian status in any other sense of the word. It noted that "while LaPier may be an Indian in an anthropological or ethnohistorical sense, he is not an Indian for purposes of criminal jurisdiction." *LaPier* v. *McCormick*, supra, 986 F.2d 306 n.5; see also *United States* v. *Antelope*, supra, 430 U.S. 646 ("Federal regulation of Indian tribes . . . is governance of once-sovereign political communities . . . . [R]espondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe."); *United States* v. *Heath*, supra, 509 F.2d 19 ("[w]hile anthropologically a Klamath Indian even after the [Klamath] Termination Act [25 U.S.C. § 564 et seq.] obviously remains an Indian, his unique status vis-a-vis the Federal Government no longer exists"). Similarly, although the defendant in the present case "may be an Indian in an anthropological or ethnohistorical sense" and belongs to a tribe that has a special relationship with the state that is recognized in our General Statutes, these factors do not confer federal Indian status on the defendant for purposes of criminal jurisdiction.

(considering federal court precedent that interprets federal statute); see also *Schnabel* v. *Tyler*, 230 Conn. 735, 743 n.4, 646 A.2d 152 (1994) (noting that court looks to Second Circuit precedent that interprets federal statute); *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 329 and n.20, 627 A.2d 909 (1993) (same); *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992) (same). Because *LaPier* is the only federal precedent that is precisely on point, its holding, although not binding on us, is entitled to significant weight. More importantly, we are persuaded by the analysis employed by the Ninth Circuit in *LaPier*.

Implicit in the federal case law adopting the *St. Cloud* test is the requirement that the tribe to which a defendant claims membership or affiliation have been federally acknowledged. See footnotes 27 and 28 of this opinion. We have discovered no federal case law, and the defendant has not brought any to our attention, in which a court has held that a defendant is an Indian for federal criminal jurisdiction purposes even though he failed to allege membership in, or affiliation with, a federally acknowledged tribe.

Furthermore, we concur in the Ninth Circuit's conclusion that the decision to acknowledge a tribe federally *for criminal jurisdictional purposes* is a political question.[36] As the United States Supreme Court has stated, the federal regulation of criminal conduct involving Indians in Indian country "is rooted in the unique status

---

[36] Indeed, the defendant himself has made the alternative argument that "the questions raised in this appeal are political questions which require nonjudicial remedies," and that a state trial court is not competent to undertake the task that has been delegated to the BIA. He claims that "[u]ntil such time as a final determination is made by the BIA and/or there is a resolution by the United States Congress, the state is powerless to act unilaterally." Because a trial court has an independent obligation to determine its own subject matter jurisdiction, however, we must address the trial court's authority to conduct such an undertaking, regardless of the outcome.

of Indians as a 'separate people' with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities . . . ." *United States* v. *Antelope*, supra, 430 U.S. 646. Consequently, "the special federal role in regulating the tribes as a separate people with their own political institutions is the foundation for federal criminal jurisdiction over Indians in Indian country. . . . It is therefore the existence of the special relationship between the federal government and the tribe in question that determines whether to subject the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country." (Citation omitted; internal quotation marks omitted.) *LaPier* v. *McCormick*, supra, 986 F.2d 305. Thus, we conclude that a state court's determination regarding whether the Paucatuck Eastern Pequot Tribe would satisfy the BIA regulations governing federal acknowledgment, at least for purposes of criminal jurisdiction, would require an "initial policy determination of a kind clearly for nonjudicial discretion"; *Baker* v. *Carr*, supra, 369 U.S. 217; and, therefore, "inextricably [would present] a political question not amenable to judicial resolution." *Nielsen* v. *State*, 236 Conn. 1, 9, 670 A.2d 1288 (1996). Consequently, we agree with the Ninth Circuit that the determination whether the federal government should acknowledge a tribe as a sovereign entity for purposes of criminal jurisdiction directly implicates a question that is properly left to the political branches.

We note, moreover, that such an undertaking by a state court would also raise serious federalism concerns. Of course, principles of federalism generally do not bar state courts from deciding questions of federal law. Indeed, as the United States Supreme Court recently has noted, "[i]nterpretation of federal law is the proprietary concern of state, as well as federal, courts. It is the right and duty of the States, within

their own judiciaries, to interpret and to follow the Constitution and all laws enacted pursuant to it, subject to a litigant's right of review in this Court in a proper case." *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 275, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997). Conversely, however, a "[s]tate may not trespass on the authority of [a] federal agency." *Maryland* v. *Louisiana*, 451 U.S. 725, 751, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981). Because a determination by the trial court regarding whether the defendant's tribe is entitled to federal acknowledgment necessarily would intrude upon the authority of the BIA, the federal agency to which Congress has delegated that decision, principles of federalism militate against such an approach.

In addition, several other, albeit related, prudential concerns also caution against requiring state trial courts to determine the status, for federal purposes, of Indian tribes. First, that decision is at best a highly complex one requiring an in-depth understanding of the historical relationship between the applicant tribe and the federal government.[37] Indeed, in this case, the defendant

[37] "The federal acknowledgment procedures require that a group seeking recognition present a petition to the BIA with evidence that the tribe meets each of seven criteria." Comment, "The Imprimatur of Recognition: American Indian Tribes and the Federal Acknowledgment Process," 66 Wash. L. Rev. 209, 216 (1991). These criteria include: "(a) The petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900. . . . (b) A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present. . . . (c) The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present. . . . (d) [The petitioner has provided a] copy of the [petitioner's] present governing document including its membership criteria [or, in] the absence of a written document, the petitioner must provide a statement describing in full its membership criteria and current governing procedures. . . . (e) The petitioner's membership [consists] of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity. . . . (f) [Absent special conditions, t]he membership of the petitioning group is composed principally of persons who are not members of any acknowledged North American Indian tribe. . . . (g) Neither the peti-

sought to introduce into evidence twenty-eight volumes of materials that the "Eastern Pequot Tribe" had submitted to the BIA in support of its acknowledgment application. We note that the review by the BIA of the tribe's application has been ongoing since 1989. In light of the magnitude and specialized nature of the task associated with the acknowledgment determination, it is highly preferable that it be performed by the federal administrative agency to whom Congress has delegated that responsibility rather than by a state court in the context of a criminal prosecution.

Second, the United States, in its amicus brief, takes the position that it lacks jurisdiction over the Paucatuck Eastern Pequot reservation except with regard to federal crimes of general applicability. Moreover, the parties dispute whether tribal courts are available on the reservation. Even if we assume, arguendo, that tribal courts do operate on the Paucatuck Eastern Pequot reservation, the defendant does not contest the state's assertion that any such courts have not been approved by the United States Secretary of the Interior. These considerations, in combination with the uncertainty regarding who has criminal jurisdiction over offenses committed by Paucatuck Eastern Pequot tribal members on reservation property, could leave the inhabitants of the reservation facing serious gaps in police

tioner nor its members are the subject of congressional legislation that has expressly terminated or forbidden the Federal relationship." 25 C.F.R. § 83.7 (a) through (g).

"Once a petition is complete, the BIA appoints a team of experts to determine the tribe's status. Typically, the team includes [a] historian, an anthropologist, and a genealogist, each of whom issues a report evaluating the evidence in light of the published criteria. Petitioners provide the bulk of the research, but BIA experts may conduct additional research when evaluating petitions.

"Upon completing their analyses, the BIA experts combine or summarize their reports and issue proposed findings with regard to the petition. Following a notice and comment period, the Assistant Secretary of Indian Affairs authorizes and issues the final determination." Comment, supra, 66 Wash. L. Rev. 216–17.

protection until a trial court has made its determination.[38]

Third, the prospect that a criminal defendant can, in effect, compel a state court to determine whether a tribe should receive federal acknowledgment status is a troubling one. Because the regulations of the BIA require that a tribe compile extensive documentary evidence in support of its claim; see 25 C.F.R. § 83.7; there exists the real possibility that a tribe might be forced to assert its federal acknowledgment claim prematurely. Indeed, a tribe conceivably could be made to litigate its status in a criminal forum in which it otherwise is not a party, in which it has little or no control over a defendant's introduction of supporting documentation, and in which it would not have the ability to supplement the material submitted in support of its claim, as it would in connection with an application for federal acknowledgment filed with the BIA.

Finally, we are mindful of the need for predictability in the area of criminal enforcement and jurisdiction. Indeed, we can think of no better place for a bright line rule, like that adopted by the Court of Appeals for the Ninth Circuit in *LaPier*, than in the criminal context, with its patchwork of federal, state and tribal jurisdiction.

The defendant, for several reasons, claims that we should not follow *LaPier*. First, relying on *Pittsburgh & Midway Coal Mining Co.* v. *Watchman*, 52 F.3d 1531, 1545 n.15 (10th Cir. 1995), the defendant contends that the *LaPier* court utilized the "western," rather than the "eastern," test for determining Indian status, and that the former test is inapposite to the Paucatuck Eastern

---

[38] Indeed, because "[t]here is no evidence that the federal government would take any action in this [particular] case," if the "[defendant] prevail[s]," the apparent result is that [he] will escape all criminal prosecution." *State* v. *St. Francis*, 151 Vt. 384, 391, 563 A.2d 249 (1989).

Pequot Tribe. Second, he claims that the court in *LaPier* qualified its decision because it indicated that it could have reached a different result had there been evidence in that case that the BIA list of federally acknowledged tribes was incomplete. Third, the defendant claims that this state's statutory recognition of the Paucatuck Eastern Pequot Tribe is tantamount to an admission that the tribe is entitled to federal acknowledgment. Fourth, the defendant, relying upon *United States* v. *Cook*, 922 F.2d 1026 (2d Cir.), cert. denied, 500 U.S. 941, 111 S. Ct. 2235, 114 L. Ed. 2d 477 (1991), contends that the Court of Appeals for the Second Circuit has not treated a criminal defendant's membership in a federally acknowledged Indian tribe as "a determinative factor or sine qua non" for purposes of federal criminal jurisdiction and, therefore, that we should not do so either.[39] Finally, the defendant maintains that *LaPier* is inconsistent with the Second Circuit's recent decision in *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51 (2d Cir. 1994) (hereinafter *Golden Hill*). We are not persuaded by any of the defendant's arguments.

The defendant's first argument merits little discussion. The distinction drawn in *Pittsburgh & Midway Coal Mining Co.* v. *Watchman*, supra, 52 F.3d 1531, between the so-called "western" and "eastern" tests[40]

---

[39] At oral argument, the defendant also contended that because the Indian Civil Rights Act predates the regulations governing federal acknowledgment, Congress could not have contemplated federal acknowledgment as a basis for determining Indian status under the Indian Civil Rights Act. We disagree. Even though these regulations were promulgated in 1974, several years after the Indian Civil Rights Act was enacted, Congress' delegation to the executive branch of the authority to acknowledge tribes occurred more than one century before the Indian Civil Rights Act became law. See 25 U.S.C. §§ 2, 9.

[40] Two tests for determining whether an area is a "dependent Indian community" and, consequently, Indian country, have been articulated by various courts that have considered this question. First, in *State* v. *Dana*, 404 A.2d 551 (Me. 1979), cert. denied, 444 U.S. 1098, 100 S. Ct. 1064, 62 L. Ed. 2d 785 (1980), the Supreme Court of Maine established a test to be applied specifically to eastern tribes, a test that we adopted in *Schaghticoke*, supra, 217 Conn. 620. See footnote 23 of this opinion. That test, however, has not been applied by any federal court, including the Court of Appeals for the First Circuit.

has no bearing on this case because it relates solely to the question of whether a reservation falls within the definition of "dependent Indian community" under 18

A second test, adopted by the Court of Appeals for the Eighth Circuit is based on the approach originally established in *United States* v. *Martine*, 442 F.2d 1022, 1023 (10th Cir. 1971), where the court cited with approval the trial court's decision to consider "the nature of the area in question, the relationship of the inhabitants in the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area." Under the expanded version of the *Martine* test, a court must consider the following factors to determine whether an area is a dependant Indian community: "(1) whether the United States has retained title to the lands which it permits the Indians to occupy and authority to enact regulations and protective laws respecting this territory; (2) the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area; (3) whether there is an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality; and (4) whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples." (Internal quotation marks omitted.) *Pittsburgh & Midway Coal Mining Co.* v. *Watchman*, supra, 52 F.3d 1545. Variations of this test have been applied by the Courts of Appeal for the First, Second, Eighth, Ninth and Tenth Circuits. See *Narragansett Indian Tribe* v. *Narragansett Electric Co.*, 89 F.3d 908, 917 (1st Cir. 1996) (applying all four factors); *Pittsburgh & Midway Coal Mining Co.* v. *Watchman*, supra, 1545 (Tenth Circuit applied all four factors); *United States* v. *Cook*, supra, 922 F.2d 1031 (Second Circuit applied second factor); *Alaska* v. *Native Village of Venetie*, 856 F.2d 1384, 1391 (9th Cir. 1988) (citing four factors with approval); *United States* v. *Levesque*, 681 F.2d 75, 77 (1st Cir.), cert. denied, 459 U.S. 1089, 103 S. Ct. 574, 74 L. Ed. 2d 936 (1982) (applying second factor); *United States* v. *South Dakota*, 665 F.2d 837, 839 (8th Cir. 1981), cert. denied, 459 U.S. 823, 103 S. Ct. 52, 74 L. Ed. 2d 58 (1982) (expanding *Martine* to four factors). The Tenth Circuit determined, in applying the second factor of the above test, that "[t]he testimony of enforcement officers and [BIA] officials" is relevant. *United States* v. *Martine*, supra, 1023–24. Moreover, the Second Circuit has noted that "[t]he phraseology in issue thus seems intended to afford federal criminal jurisdiction over [offenses] committed by Indians in communities which . . . are both Indian in character and federally dependent." (Brackets in original; internal quotation marks omitted.) *United States* v. *Cook*, supra, 1031, quoting *United States* v. *Levesque*, supra, 77.

The state urges us to revisit and reconsider the test set forth in *Schaghticoke* for determining what constitutes a dependent Indian community. Because it is unnecessary for us to do so for purposes of this appeal, we decline the state's invitation.

U.S.C. § 1151 and, therefore, is Indian country under the Indian Civil Rights Act. Because we need not decide this question, the federal and state case law delineating the differences between the history of Indian tribes in eastern and western United States is irrelevant to the resolution of this appeal. Cf. *Schaghticoke*, supra, 217 Conn. 617–19.

We also are unpersuaded that the court in *LaPier* limited its deference to the BIA list of acknowledged tribes in the manner asserted by the defendant. LaPier, like the defendant in this case, had claimed to be affiliated with a tribe that had an application for federal acknowledgment pending with the BIA. See footnote 30. In rendering its decision, the Ninth Circuit emphasized that the tribe to which LaPier claimed membership was not listed by the BIA as having been acknowledged by the federal government, and that "[a]bsent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry." *LaPier* v. *McCormick*, supra, 986 F.2d 305. The Ninth Circuit's reference to "incompleteness" most likely refers to the possibility of a tribe having received federal acknowledgment *after* the BIA list last had been published. Because the defendant concedes that the Paucatuck Eastern Pequot Tribe has not been acknowledged by the BIA or by Congress, he cannot claim that the Paucatuck Eastern Pequot Tribe is not on the BIA list because that list is incomplete.

The defendant next contends that the state's statutory recognition of the Paucatuck Eastern Pequot Tribe should be treated as a concession by the state that the tribe satisfies the requirements for federal acknowledgment. No authority exists for the proposition that a state has the authority to determine whether a tribe that has not been acknowledged formally by the federal

government satisfies the requirements for federal acknowledgment. Cf. 25 C.F.R. § 83.7 (a) (2) (1997) (BIA considers petitioning group's relationship with state in evaluating its Indian identity); S. O'Brien, "Tribes and Indians: With Whom Does the United States Maintain a Relationship?," 66 Notre Dame L. Rev. 1461, 1476–77 (1991) (discussing federal benefits linked to state recognition of tribes). Moreover, our legislature has expressly disclaimed any ability to confer federal recognition on a state recognized tribe.[41] Accordingly, the state's decision to recognize the Paucatuck Eastern Pequot Tribe based on the *state's* relationship with that tribe provides no support to the defendant's claim that such recognition also entitles the tribe to *federal* acknowledgment.

We also conclude that the defendant's reliance on the decision of the Court of Appeals for the Second Circuit in *United States* v. *Cook*, supra, 922 F.2d 1026, is misplaced. The defendants in *Cook*, members of the federally acknowledged St. Regis Mohawk Tribe, were convicted in District Court of various gambling offenses. They appealed their convictions to the Second Circuit, claiming that their gambling establishments were not located in Indian country and that, consequently, the federal government lacked jurisdiction to prosecute them. Id., 1029–30. In affirming the defendants' convictions, the court in *Cook* concluded that the trial court properly had determined that the offenses had occurred within Indian country because the tribal land on which the gaming devices were located was situated within a dependent Indian community. Id., 1030–31; see footnote 22 of this opinion. The Second

---

[41] General Statutes § 47-66h (b) provides: "*Nothing in this chapter shall be construed to confer tribal status under federal law on the indigenous tribes named in section 47-59a* or to confer additional rights of ownership and title to such tribes to land in the state which was not held in trust for such tribes on June 1, 1989." (Emphasis added.)

Circuit had no occasion, therefore, to consider the juris-dictional question raised in this appeal. Accordingly, *Cook* has no bearing on our resolution of this case.[42]

The defendant also suggested, in his supplemental brief, that the result that we reach in this case is incon-sistent with the decision of the Second Circuit in *Golden Hill*, supra, 39 F.3d 51. In *Golden Hill*, the state sought dismissal of the plaintiff tribe's land claim under the Nonintercourse Act; see footnote 17 of this opinion; on the ground that the tribe, whose federal acknowledg-ment application with the BIA was pending, lacked standing to bring such a claim as an Indian tribe within the meaning of the act. The District Court had dismissed the action without prejudice in light of the fact that the BIA had not yet decided the tribe's application. *Golden Hill*, supra, 55. On appeal from the District Court's judgment of dismissal, the Second Circuit reinstated the tribe's action after concluding that, although it was appropriate for the District Court to defer to the BIA in resolving the federal acknowledgment issue, the Dis-trict Court should have stayed the action to allow the BIA the opportunity to act on the tribe's application. Id., 59–60. We conclude that our holding in this case, which follows the holding of *LaPier* v. *McCormick*, supra, 986 F.2d 303, is not inconsistent with *Golden Hill*.

In *Golden Hill*, the central issue was the question of the tribe's standing to bring a claim under the civil Nonintercourse Act, which, unlike the federal statutes discussed herein, has been held by federal courts *not* to require that a tribe be federally acknowledged. Thus, in discussing the history of the Nonintercourse Act, the Second Circuit noted that "[f]ederal courts have held

---

[42] The defendant also claims that our decision in *Schaghticoke*, supra, 217 Conn. 612, controls the outcome of this case. *Schaghticoke*, however, also is inapposite because it did not involve a criminal prosecution but, rather, a civil action between the plaintiff tribe and its alleged tribal chief in which the state sought to intervene. See footnote 23 of this opinion.

that to prove tribal status under the Nonintercourse Act, an Indian group must show that it is a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory. See, e.g., *United States* v. *Candelaria*, 271 U.S. 432, 442, 46 S. Ct. 561, 563, 70 L. Ed. 1023 (1926) (quoting *Montoya* v. *United States*, 180 U.S. 261, 266, 21 S. Ct. 358, 359–60, 45 L. Ed. 521 (1901)); *Catawba Indian Tribe* [v. *South Carolina*, 718 F.2d 1291, 1298 (4th Cir. 1983), aff'd, 740 F.2d 305 (4th Cir. 1984), rev'd on other grounds, 476 U.S. 498, 106 S. Ct. 2039, 90 L. Ed. 2d 490 (1986)]; [*Joint Tribal Council of Passamaquoddy Tribe* v. *Morton*, 528 F.2d 370, 377 n.1 (1st Cir. 1975)]. The formulation of this standard and its use by the federal courts occurred after Congress delegated to the executive branch the power to prescribe regulations for carrying into effect statutes relating to Indian affairs, see 25 U.S.C. § 9, and *without regard to whether or not the particular group of Indians at issue had been [acknowledged] by the Department of the Interior.* See, e.g., [*United States* v. *Candelaria*, supra, 442; *Catawba Indian Tribe* v. *South Carolina*, supra, 1298; *Joint Tribal Council of Passamaquoddy Tribe* v. *Morton*, supra, 377]." (Emphasis added; internal quotation marks omitted.) *Golden Hill*, supra, 39 F.2d 59. "[Consequently] . . . tribal status for purposes of obtaining federal benefits is not necessarily the same as tribal status under the Nonintercourse Act. . . . The Tribe's claim is not cognizable in the first instance solely by the BIA. In fact, the BIA lacks the authority to determine [the] plaintiff's land claim. Regardless of whether the BIA were to acknowledge [the] Golden Hill [Paugussett Tribe] as a tribe for purposes of federal benefits, [the] Golden Hill [Paugussett Tribe] must still turn to the [D]istrict [C]ourt for an ultimate judicial determination of its claim under the Nonintercourse Act." (Citations omitted.) Id., 57–58.

Despite the case law holding that federal acknowledgment was not a necessary prerequisite for standing under the Nonintercourse Act, the Second Circuit concluded that "[w]here a statute confers jurisdiction over a general subject matter to an agency and that matter is a *significant component of a dispute properly before the court*, it is desirable that the agency and the court go down the same track—although at different times—to attain the statute's ends by their coordinated action.

"Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the legislative scheme. . . . The BIA has the authority to prescribe regulations for carrying into effect any act relating to Indian affairs. See 25 U.S.C. § 9 (1988). Before the promulgation of the acknowledgment regulations there did not exist a uniform, systematic procedure to determine tribal status within the Department of the Interior.[43] Therefore, deferral of the

---

[43] The Second Circuit summarized the relevant history of the federal acknowledgment process as follows: "In 1832 Congress established the position of Commissioner of Indian Affairs (currently within the Department of the Interior) and delegated to the Commissioner the authority to manage all Indian affairs. See Act of July 9, 1832, ch. 174, § 1, 4 Stat. 564 (codified at 25 U.S.C. §§ 1, 2 (1988)). Two years later Congress granted the President authority to 'prescribe such rules and regulations as he may think fit, for carrying into effect the various provisions of [any act] relating to Indian affairs. . . .' Act of June 30, 1834, ch. 162, § 17, 4 Stat. 735, 738 (codified as amended at 25 U.S.C. § 1 et seq. (1988)). At the same time Congress established the Department of Indian Affairs, predecessor to the BIA. See Act of June 30, 1834, ch. 162, 4 Stat. 735 (codified as amended at 25 U.S.C. § 9 et seq. (1988)).

"Between 1834 and 1871 Congress continued to deal directly by means of its treaty-making power with American Indian tribes, but in 1871 recognition by treaty ended as Congress terminated its treaty-making authority. See Act of March 3, 1871, ch. 120, § 1, 16 Stat. 544, 566 (codified at 25 U.S.C. § 71 (1988)). Numerous reasons were advanced for termination of Indian policy based on treaty negotiations. After the War of 1812 the military importance of alliances with Indian tribes was diminished. The movement to end treaty making gained strength as a result of alliances between some of the southern Indian tribes and the Confederacy. The final decision to end treaty making resulted from a movement by members of the House of

issue of tribal status was not required nor would it aid a court in its determination. The Department of the Interior's creation of a structured administrative process to acknowledge 'nonrecognized' Indian tribes using uniform criteria, and its experience and expertise in applying these standards, has now made deference to the primary jurisdiction of the agency appropriate. In fact, the creation in 1978 of the acknowledgment process currently set forth in 25 C.F.R. Part 83—a comprehensive set of regulations, the BIA's experience and expertise in implementing these regulations, and the flexibility of the procedures weigh heavily in favor of a court's giving deference to the BIA. We need not decide whether deference would be appropriate if no recognition application were pending, but deferral is fully warranted here [under the doctrine of primary jurisdiction] where the plaintiff has already invoked the BIA's authority." (Citation omitted; emphasis added.) *Golden Hill*, supra, 39 F.3d 59–60. The Second Circuit

Representatives to equalize power between that body and the Senate through the removal of Indian relations from the treaty-making process. When formal treaty making was abandoned, the federal government continued to make agreements with Indian tribes, similar to treaties, but requiring approval by both houses of Congress, and government policy with respect to Indians was expressed through legislation and executive orders. See generally [F.] Cohen, [supra, pp. 105–107].

"The Department of the Interior did not actively begin to engage in recognition determinations until after the passage of the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461–479 (1988)). After passage of the Indian Reorganization Act recognition proceedings were necessary because the benefits created by it were made available only to descendants of 'recognized' Indian tribes. See 25 U.S.C. § 479.

"Between 1934 and 1978 the Department of the Interior and the BIA recognized American Indian tribes on a case-by-case basis. See 59 Fed. Reg. 9280, 9280 (1994). In 1978 the Department of the Interior promulgated regulations establishing a uniform procedure for acknowledging American Indian tribes. Id.; see 25 C.F.R. §§ 83.1–83.13 (1994). Under these regulations recognition creates a government-to-government relationship between the tribe and the United States, and makes the tribe eligible for those services and benefits available to other federally recognized tribes. See [25 C.F.R.] § 83.2." *Golden Hill*, supra, 39 F.3d 57.

directed the District Court to stay the tribe's action for eighteen months in order to permit the BIA to decide the tribe's application for federal acknowledgment.[44] Id., 60–61.

As we have discussed, the federal acknowledgment status of a tribe is not merely a *significant* component of the federal government's exercise of criminal jurisdiction over an Indian tribe, as it was held to be by the Second Circuit relative to claims under the Nonintercourse Act. Contrary to the more limited role that the federal acknowledgment process has been held to play under the civil Nonintercourse Act, federal acknowledgment is the very essence of the government-to-government relationship that underlies federal criminal jurisdiction. Accordingly, we are aware of no support for the defendant's contention that a member of a tribe that is not included on the BIA's list of federally acknowledged tribes nevertheless may prevail on a claim that his state prosecution is federally preempted.[45]

We emphasize, moreover, the overriding practical difficulties associated with staying a criminal case until the BIA has reached its acknowledgment determination. A lengthy stay like that imposed by the Second Circuit in *Golden Hill* likely would run afoul of a defendant's constitutional and statutory speedy trial rights.[46] See

---

[44] The Second Circuit also indicated that if the BIA had not rendered an acknowledgment decision by the expiration of the eighteen month period, the District Court was authorized, absent a showing of good cause why the stay should not be dissolved, to reach the merits of the standing issue. *Golden Hill*, supra, 39 F.3d 60–61.

[45] Indeed, in discussing the *Golden Hill* decision, the dissent blurs this distinction between that civil case, which involved the plaintiff tribe's standing to pursue a claim under the Nonintercourse Act, and existing federal precedent delineating federal criminal jurisdiction over Indians in Indian country.

[46] Of course, the legal and practical difficulties of a stay in a criminal case would be greatly exacerbated in a case in which a defendant was incarcerated pending his or her trial.

U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; General Statutes § 54-82m; Practice Book § 956B. Furthermore, we note that the defendant in this case has neither sought a stay nor consented to one.[47] Finally, law enforcement authorities at the tribal, state and federal levels are entitled to clear guidance from the courts regarding their respective criminal jurisdiction in order best to serve and protect the public.

In addition, as previously discussed, this case exemplifies the complexity and length of the federal acknowledgment process. The Paucatuck Eastern Pequot Tribe filed its petition for federal acknowledgment in 1989. Although the defendant represented at oral argument that his tribe's petition was in its final stages and would be decided before that of any other tribe, he also conceded that the BIA's final decision could take more

[47] Although the dissent contends that the defendant should be given the option of consenting to a stay for an unspecified "reasonable period of time" to allow the BIA to make its determination, we conclude that the dissent's approach is unworkable. First, we note that, even if a defendant is willing to consent to a prolonged stay in a criminal case to permit the BIA to perform its federal acknowledgment determination, an independent public interest exists in the "disposition of criminal charges with all reasonable dispatch." (Internal quotation marks omitted.) *State* v. *Beckenbach*, 198 Conn. 43, 52 n.5, 501 A.2d 752 (1985). Indeed, "the public interest demands that criminal proceedings be prosecuted with dispatch . . . and the greater the delay between the charge and the trial date, the greater the likelihood that witnesses will be unable to appear or that their memories will have faded and their testimony will be less convincing." (Citation omitted.) *United States* v. *Tortora*, 464 F.2d 1202, 1208–1209 (2d Cir.), cert. denied, 409 U.S. 1063, 93 S. Ct. 554, 34 L. Ed. 2d 516 (1972). Second, under the dissent's approach, the defendant's decision whether to consent to a stay would determine whether the trial court applied the doctrine of primary jurisdiction or, in the alternative, decided the federal acknowledgment status of the Paucatuck Eastern Pequot Tribe at the outset. We are aware of no precedent for the proposition that a *party*, in consenting to a stay, can thereby determine whether a *court* applies the doctrine of primary jurisdiction. Finally, the dissent, in reaching its conclusion, relies heavily on the alleged facts underlying the defendant's infraction. See footnote 9 of this opinion. We know of no reason, however, and the dissent suggests none, why the defendant in this case should be treated any differently for purposes of criminal

than two additional years because the tribe was not yet in the active consideration stage with the BIA.[48] Given that the defendant's infraction was committed four years ago, a stay of an additional two years would bring the total delay in the resolution of the defendant's case to six years. For these reasons, a stay of criminal proceedings is not a viable option.

Thus, the standing issue addressed by the Second Circuit in *Golden Hill* in the context of a civil land claim raises substantially different questions, and implicates substantially different interests, than the criminal prosecution addressed in this appeal. In light of those differences, and because these cases involve completely different statutory schemes, we are persuaded that our determination in this case, which follows the Ninth Circuit's resolution of the same issue in *LaPier* v. *McCormick*, supra, 986 F.2d 303, is not inconsistent with the Second Circuit's decision in *Golden Hill*, supra, 39 F.3d 51.

Accordingly, the issue of whether the defendant is an Indian for purposes of establishing federal criminal jurisdiction, as opposed to standing under the Nonintercourse Act, implicates a political question best left to the federal acknowledgment process performed by the BIA. In the absence of actual proof that the federal government has acknowledged the defendant's tribe and, therefore, that he is an Indian, we conclude that the state's exercise of criminal jurisdiction over the

jurisdiction under the Indian Civil Rights Act than any other defendant who claims Indian status under the act.

[48] At oral argument, the defendant conceded that, contrary to the stipulation entered into by the parties in this case, the Paucatuck Eastern Pequot Tribe had not yet entered active consideration status with the BIA but, rather, was first on the waiting list for such consideration. The defendant further represented that, after the tribe finally had entered active consideration at an unspecified point in the future, it *then* could take more than two years for a determination to be issued by the BIA.

defendant was not preempted by the Indian Civil Rights Act.

## B

## Antialienation Provisions

The defendant further claims that, even if the state had properly assumed criminal jurisdiction over his tribe under the Indian Civil Rights Act, his federal preemption claim finds support under the federal Nonintercourse Act and various other related statutory and regulatory provisions. In particular, he contends that 25 U.S.C. § 1322 (b),[49] the Nonintercourse Act,[50] and 25 C.F.R. § 1.4[51] preclude the state from exercising criminal jurisdiction in this case. First, the defendant claims that because the Nonintercourse Act applies as a restraint upon the alienation of the Paucatuck Eastern Pequot reservation lands,[52] § 1322 (b) operates to prohibit the trial court from adjudicating the ownership or right to possession of any interest in Indian land that is subject to a restraint upon alienation. Second, the defendant argues that, under 25 C.F.R. § 1.4, the state is precluded from "governing, regulating, or controlling the use or development of any real or personal property . . . belonging to any Indian or Indian tribe, band, or community that is . . . subject to a restriction against alienation by the United States." Finally, the defendant

---

[49] See footnote 18 of this opinion.

[50] See footnote 17 of this opinion.

[51] See footnote 19 of this opinion.

[52] Relying on *Mohegan Tribe* v. *Connecticut*, 528 F. Sup. 1359, 1365 (D. Conn. 1982), a land claim brought by the plaintiff tribe under the Nonintercourse Act, the defendant contends that the Paucatuck Eastern Pequot reservation clearly is subject to a restraint upon alienation imposed by the federal government pursuant to the Nonintercourse Act. Because we conclude that the Nonintercourse Act, even if applicable to the Paucatuck Eastern Pequot Tribe, does not preempt the state's exercise of criminal jurisdiction over the defendant, we express no opinion regarding the Paucatuck Eastern Pequot Tribe's ability to pursue an action under the Nonintercourse Act.

contends that because his arrest resulted from "the assertion of competing property rights, a conflict over governmental control and questions of jurisdiction," his prosecution was barred by federal law governing restraints on alienation of land.

Even if we were to assume, arguendo, that the statutory and regulatory provisions cited by the defendant apply to the Paucatuck Eastern Pequot reservation lands, the defendant fails to cite any state or federal authority for the proposition that a criminal prosecution arising from a dispute over the use of reservation property implicates any of the antialienation provisions upon which he relies.[53] Moreover, the defendant's arguments incorrectly assume that the Nonintercourse Act applies to the specific facts of this case and provides the basis

---

[53] The trial court addressed the flaw in the logic of the defendant's argument during its colloquy with defense counsel regarding the defendant's first motion to dismiss:

"[The Court]: [T]he motion to dismiss is divided into five separate claims of law—five separate paragraphs. The first paragraph states or claims that the State lacked subject matter jurisdiction because the Federal [Indian] Civil Rights Act, which prohibits courts from exercising jurisdiction or any adjudicatory power over claims relating to the rights of possession, ownership, or any other interest of Indian lands, and then it goes on to specify that the state has no authority to adjudicate titles or property rights involving Indian land. Is that your claim? Is that what the claim is?

"[Defense Counsel]: Yes, it is, Your Honor. . . .

"[The Court]: Supposing I went home today and found the Highway Department tearing up my hedges, and I said to them, 'You're on my land,' and they say, 'No, this is [an] interstate highway or the town highway' and I get a stick and start beating them over the head and shoulders and I'm arrested for breach of peace. Is there a real estate title problem involved in that?"

The defendant's repeated attempts to transform this case from a criminal action, resulting from his decision to block access to town property with his vehicle, into a civil action, involving the town's attempt to alienate Paucatuck Eastern Pequot land, are unavailing. This case is not a civil action between the Paucatuck Eastern Pequot Tribe and the town regarding whether the town had authority to widen the road; it is a criminal action in which the state is prosecuting the defendant for creating a disturbance. The defendant's underlying reasons for committing this infraction, however compelling, are not at issue in this case.

for the application of the various restrictions on alienation of Indian land. Even if the Nonintercourse Act applies to restrict the Paucatuck Eastern Pequot Tribe's conveyance of reservation property, however, we disagree with the defendant's claim that this converts the reservation into Indian country under the Indian Civil Rights Act. See, e.g., *Buzzard* v. *Oklahoma Tax Commission*, 992 F.2d 1073, 1076–77 (10th Cir.), cert. denied, 510 U.S. 994, 114 S. Ct. 555, 126 L. Ed. 2d 456 (1993) (requirement under Nonintercourse Act that tribe obtain federal government's approval before disposing of land owned by tribe does not convert land purchased by tribe into Indian country exempt from state jurisdiction); but cf. *State* v. *Dana*, 404 A.2d 551, 554–55 (Me. 1979), cert. denied, 444 U.S. 1098, 100 S. Ct. 1064, 62 L. Ed. 2d 785 (1980) (considering existence of "Indian title" under Nonintercourse Act in determining whether state had criminal jurisdiction).

Furthermore, even if it is assumed, arguendo, that the Nonintercourse Act could serve as a basis for an antialienation claim under the Indian Civil Rights Act, several federal courts in this district have concluded that it is inappropriate to consider a land claim under the Nonintercourse Act until the group's application for federal acknowledgment has been considered by the BIA. See, e.g., *United States* v. *43.47 Acres of Land More or Less*, 855 F. Sup. 549, 552 (D. Conn. 1994) (group lacking federal acknowledgment cannot contest extinguishment of property interest absent certification by BIA that it actually represents tribe); *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 839 F. Sup. 130 (D. Conn. 1993) (concluding that tribe lacking federal acknowledgment must exhaust administrative remedies with Department of Interior before suing under Nonintercourse Act), remanded with direction, *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51 (2d Cir. 1994) (same; action ordered stayed eighteen

months pending consideration by BIA of group's claim for federal acknowledgment). Finally, it is well established that claims brought by individual Indians and their representatives are not cognizable under the Nonintercourse Act; see, e.g., *United States* v. *Dann*, 873 F.2d 1189, 1195 (9th Cir.), cert. denied, 493 U.S. 890, 110 S. Ct. 234, 107 L. Ed. 2d 185 (1989) (individual Indians lack standing to contest transfer of land as violation of Nonintercourse Act); *James* v. *Watt*, 716 F.2d 71, 72 (1st Cir. 1983), cert. denied, 467 U.S. 1209, 104 S. Ct. 2397, 81 L. Ed. 2d 354 (1984) (individual Indians who neither sought to represent tribe nor named tribe as plaintiff in suit cannot maintain suit under Nonintercourse Act); *Epps* v. *Andrus*, 611 F.2d 915, 918 (1st Cir. 1979) (individual Indians lacked standing to bring claim under Nonintercourse Act); *Canadian St. Regis Band of Mohawk Indians* v. *New York*, 573 F. Sup. 1530, 1534–35 (N.D.N.Y. 1983) (same); cf. *United States* v. *43.47 Acres of Land More or Less*, supra, 552 (group seeking to represent tribe cannot maintain suit under Nonintercourse Act absent proof that it was valid tribal representative); and the defendant has provided no authority to the contrary. Accordingly, the defendant's antialienation claim is without merit.

## III

## INDIAN TRIBAL SOVEREIGNTY

In addition to his claim that federal law preempts the state action taken in this case, the defendant also raises a claim of tribal sovereignty. The defendant contends that the trial court should have dismissed the charge against him because the state prosecution violates the inherent sovereignty of the Paucatuck Eastern Pequot Tribe. In essence, he claims that because his arrest resulted from a land dispute between himself, acting in his official capacity as tribal vice-chairman in serving

a cease and desist order; see footnote 13 of this opinion; and the town of North Stonington, which had directed the town road crew to widen a road located on the reservation, his criminal prosecution by the state violates principles of tribal sovereignty. In particular, the defendant argues that "[w]here the tribe has asserted its sovereign rights over the [reservation] property, where it has a tribal code provision giving it exclusive jurisdiction over said property, and where the tribe's officials were acting in an attempt to protect tribal rights and to prevent substantial harm to the tribe's property, the highest deference must be made to the tribe's assertion of inherent tribal sovereignty." We reject the defendant's claim.

"Like all instrumentalities of the state of Connecticut, our courts are powerless to intervene in the exercise of tribal self-government. Federal statute, federal common law and state statute all require us to treat bona fide Indian tribes as sovereign nations and to protect tribal rights to self-determination. [*Schaghticoke*, supra, 217 Conn. 626–29]. Because of the continuing inherent sovereignty of Indian tribes, for example, federal common law forbids states from unlawfully infring[ing] on the right of reservation Indians to make their own laws and be ruled by them. . . . *White Mountain Apache Tribe* v. *Bracker*, [supra, 448 U.S. 142]; *Williams* v. *Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959). Similarly, state statutes explicitly provide that the indigenous tribes, [including the Paucatuck Eastern Pequot Tribe] are self-governing entities possessing powers and duties over tribal members and reservations. . . . General Statutes § 47-59a (b). Any action by a state court that infringed on tribal sovereignty or interfered in tribal self-government would therefore be improper.

"Our recognition of tribal sovereignty does not, however, render all matters touching upon tribal decisions nonjusticiable. As the United States Supreme Court has

made clear, tribal sovereignty does not impede state-court jurisdiction unless the exercise of state court jurisdiction in [the] case would interfere with the right of tribal Indians to govern themselves under their own laws. *Three Affiliated Tribes of the Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U.S. 138, 148, 104 S. Ct. 2267, 81 L. Ed. 2d 113 (1984). If the exercise of state court jurisdiction is compatible with tribal autonomy; id., 149; judicial action not only is permitted, but may be required. See id., 151–52 (suggesting that failure to exercise jurisdiction could violate Indians' rights under due process clause, equal protection clause and 42 U.S.C. § 1981).

"The question before us, therefore, is whether, in [permitting the prosecution of the defendant by the state], the trial court actually interfered with the exercise of tribal sovereignty." (Internal quotation marks omitted.) *Golden Hill Paugussett Tribe of Indians* v. *Southbury*, 231 Conn. 563, 574–76, 651 A.2d 1246 (1995); cf. *Schaghticoke*, supra, 217 Conn. 629 ("in order for a state enactment to impinge on tribal sovereignty, or in order for an Indian tribe to assert that it is not subject to civil jurisdiction that otherwise applies to state citizens, there [first] must be a tribe that exists as a distinct cultural or ethnic group. [Second], the tribe must have a form of demonstrable sovereignty or functioning self-government. [Finally], the state act in question must actually infringe on some exercise of tribal government or existing tribal legislation."). "Tribal immunity is just that: sovereign immunity which attaches to a tribe because of its status as a dependant domestic nation." *United States* v. *James*, 980 F.2d 1314, 1319 (9th Cir. 1992), cert. denied, 510 U.S. 838, 114 S. Ct. 119, 126 L. Ed. 2d 84 (1993); see also *United States* v. *Wheeler*, supra, 435 U.S. 323 ("Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependant status").

We conclude that, unlike *Schaghticoke*, supra, 217 Conn. 612, this case does not implicate tribal sovereignty. Even if we were to assume, arguendo, that the Paucatuck Eastern Pequot Tribe has retained its sovereignty over criminal matters,[54] that inherent sovereignty is not implicated here because the Paucatuck Eastern Pequot Tribe does not seek to bring charges against the defendant, and it is not a party to this case. Cf. *Duro* v. *Reina*, 495 U.S. 676, 684, 110 S. Ct. 2053, 109 L. Ed. 2d 693 (1990).

Furthermore, the trial court made no finding with regard to the defendant's assertion that he holds the position of vice-chairman of the Eastern Pequot Tribe, and the defendant failed to seek any articulation from the trial court with regard to that claim. In fact, the record reflects an ongoing dispute regarding tribal membership and leadership. See footnote 13 of this opinion. Moreover, even if the defendant had established that he holds the position of tribal vice-chairman, it is unclear that that fact alone would have any bearing on his sovereignty claim. See, e.g., *United States* v. *Funmaker*, 10 F.3d 1327, 1331 (7th Cir. 1993) (fact that Indian defendant was following tribal chairperson's orders did not immunize him under "police power" doctrine from federal prosecution). Indeed, it is well established that tribal sovereign immunity does not extend to individual members of a tribe, and instead must be asserted by the tribe itself. See *Puyallup Tribe, Inc.* v. *Dept. of Game*, 433 U.S. 165, 173, 97 S. Ct. 2616, 53 L. Ed. 2d 667 (1977) ("the successful assertion of tribal sovereign immunity in this case does not impair the authority of the state court to adjudicate the rights of the individual defendants [who are tribal members] over whom it properly obtained personal jurisdiction");

---

[54] The defendant failed to present any evidence to the trial court regarding the retained sovereignty of the Paucatuck Eastern Pequot Tribe over criminal matters.

*United States* v. *James,* supra, 980 F.2d 1319 (member of tribe cannot invoke tribal sovereign immunity even though tribe can do so). We conclude, therefore, that the defendant cannot assert a sovereignty claim on the basis of his membership in the Paucatuck Eastern Pequot Tribe.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., BORDEN, KATZ, MCDONALD and PETERS, Js., concurred.

BERDON, J., dissenting. I disagree with the majority's simplistic answer to the underlying pivotal question before the court[1]—whether the Paucatuck Eastern Pequot Tribe (Paucatuck tribe) is an "Indian" tribe

[1] I gather that the majority concedes, at least for the purposes of this case, that if the Paucatuck Eastern Pequot Tribe is recognized by the federal government through the Bureau of Indian Affairs, and assuming that the alleged offense occurred in "Indian country," then the state would not have jurisdiction. Rather, the jurisdiction to prosecute in that case would be with the federal government. With regard to the location where the alleged infraction took place, the state and the defendant stipulated as follows: "The land where the alleged infraction took place is the . . . Paucatuck Eastern Pequot Reservation."

Absent an express congressional grant of criminal jurisdiction to a state, criminal activity that has taken place by or against "Indians" in "Indian country" is generally exempt from state jurisdiction. See 18 U.S.C. § 1151; *United States* v. *John,* 437 U.S. 634, 651, 98 S. Ct. 2541, 57 L. Ed. 2d 489 (1978). Section 1321 of the Indian Civil Rights Act provides that states are authorized to assume criminal jurisdiction over offenses committed by or against "Indians" in "Indian country," but only with the consent of the Indian tribe occupying the Indian country, which has not been granted in this case.

The parties in this appeal have agreed that the term "Indian" in the Indian Civil Rights Act has the same meaning under the Indian Country Crimes Act, 18 U.S.C. § 1152, and the Indian Major Crimes Act, 18 U.S.C. § 1153. In order for an individual to be considered an "Indian," courts have adhered to a two-pronged test: (1) whether the individual has a significant amount of Indian blood; and (2) whether the individual has been recognized, either federally or tribally, as an Indian. See *United States* v. *Dodge,* 538 F.2d 770, 786 (8th Cir. 1976), cert. denied, 429 U.S. 1099, 97 S. Ct. 1119, 51 L. Ed. 2d 547 (1977); see also *United States* v. *Rogers,* 45 U.S. (4 How.) 567, 11 L. Ed. 1105 (1846). The state does not contest the fact that the defendant meets the first prong of the test.

within the meaning of the Indian Civil Rights Act of 1968.[2] The majority answers this issue by holding "that the decision to acknowledge a tribe federally for criminal jurisdictional purposes is a political question." In other words, according to the majority, the rights of the defendant, Mark R. Sebastian, under the Indian Civil Rights Act can vest only if the Paucatuck tribe has been formally recognized by the federal government, even though the tribe has been continuously recognized by statutes enacted by both the colonial and state governments of Connecticut, the incident occurred on recognized tribal lands, and an active application for formal recognition has been pending before the Bureau of Indian Affairs (BIA) since 1989.

The pertinent facts are not in dispute.[3] In June, 1993, a road crew working for the town of North Stonington (town) was widening a portion of Lantern Hill Road located on the Paucatuck Eastern Pequot reservation (reservation). The road crew previously had been advised that the area belonged to the reservation and, therefore, the town was not permitted to widen the road. The area in which the road crew was working contained an extremely high density of significant and sensitive archaeological sites that would be seriously damaged by the roadwork. The defendant, who is the vice-chairman of the Paucatuck tribe and a resident of the reservation, advised the second selectman of the town that the Paucatuck tribe's governing body had not authorized such work. The defendant served the second selectman with a cease and desist order to halt all road work, but the town refused to comply with the order. Subsequently, the Connecticut state police arrived at the worksite and arrested the defendant for breach of the peace because he was obstructing the road work

---

[2] 25 U.S.C. §§ 1301 through 1341.

[3] The majority contends that the state has never conceded these facts. To the contrary, the state has not contested the accuracy of these facts that were set forth in the defendant's brief.

as a result of parking his car to prevent the disturbance of the archaeological sites.

After being charged with breach of the peace, the defendant filed a motion to dismiss, arguing that the trial court lacked subject matter jurisdiction because the state does not have jurisdiction to prosecute him. Specifically, based on the parties' stipulation that the alleged offense occurred on the reservation and that the Paucatuck tribe is officially recognized by the state of Connecticut, and is under active consideration for formal recognition by the BIA, the defendant argues that only the federal government has jurisdiction to prosecute. Because the defendant is not a member of a tribe that has been formally recognized by the federal government, the trial court denied the defendant's motion to dismiss, concluding that there was no basis to bar state jurisdiction over the defendant.

The defendant requested that the trial court take judicial notice of several judicially cognizable facts set forth in his brief to this court, including the fact that the state, and previously the colony of Connecticut, had continuously recognized the tribe through legislative acts. The reservation was established by Act of the Colonial Assembly in October, 1683, and the Indian title to this land has never been extinguished. The state has enacted legislation specifically recognizing the autonomy of the Paucatuck tribe. See General Statutes § 47-59a.[4] Furthermore, an application for federal acknowledgment has been pending before the BIA since 1989

[4] General Statutes § 47-59a provides: "(a) It is hereby declared the policy of the state of Connecticut to recognize that all resident Indians of qualified Connecticut tribes are considered to be full citizens of the state and they are hereby granted all the rights and privileges afforded by law, that all of Connecticut's citizens enjoy. It is further recognized that said Indians have certain special rights to tribal lands as may have been set forth by treaty or other agreements.

"(b) The state of Connecticut further recognizes that the indigenous tribes, the Schaghticoke, *the Paucatuck Eastern Pequot*, the Mashantucket Pequot,

and is, according to the parties' stipulation, under active consideration.[5] With the exception of § 47-59a, the court declined to take judicial notice of any of the judicially cognizable facts put forth by the defendant.

In my view, because the rights of the defendant to be tried before a federal court, rather than a state court, are at stake, the defendant is entitled to an adjudication of whether he is an "Indian" for purposes of the Indian Civil Rights Act. Merely because the BIA has failed to act should not be determinative of the trial court's subject matter jurisdiction.[6]

The majority adopts the bright line approach of the Ninth Circuit Court of Appeals in *LaPier* v. *McCormick*, 986 F.2d 303, 305 (9th Cir. 1993), which inquires merely whether a tribe has been federally recognized at the time of the judicial decision, either by looking to the BIA list or to congressional enactments. Conversely, the Second Circuit Court of Appeals, the federal circuit in which this court sits, has recognized that because Congress has created a structured administrative process within the BIA to recognize Indian tribes, the court in the first instance should allow that agency to complete its congressionally delegated task. See *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51,

the Mohegan and the Golden Hill Paugussett are self-governing entities possessing powers and duties over tribal members and reservations. Such powers and duties include the power to: (1) Determine tribal membership and residency on reservation land; (2) determine the tribal form of government; (3) regulate trade and commerce on the reservation; (4) make contracts, and (5) determine tribal leadership in accordance with tribal practice and usage." (Emphasis added.)

[5] Indeed, defense counsel represented to the court at oral argument that the Paucatuck tribe's application is currently first on the waiting list for consideration by the BIA.

[6] "The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . . If at any point, it becomes apparent to the court that such jurisdiction is lacking, the appeal must be dismissed." (Internal quotation marks omitted.) *State* v. *Anonymous*, 240 Conn. 708, 718, 694 A.2d 766 (1997).

58–59 (2d Cir. 1994) (*Golden Hill*). Nevertheless, the court in *Golden Hill* also makes clear that if the BIA fails to decide the status of the tribe within a reasonable time, then the court is not only empowered, but also is obligated, to make this determination. Id., 60–61.

This court previously has recognized that, when there is a conflict among the federal circuit courts of appeal in interpreting federal law, "we generally give special consideration to decisions of the Second Circuit Court of Appeals." *Schnabel* v. *Tyler*, 230 Conn. 735, 743, 646 A.2d 152 (1994); see also *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992) ("decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of a federal statute" [internal quotation marks omitted]). Accordingly, this court should likewise follow the Second Circuit by adopting the procedure established in *Golden Hill*.[7]

In accordance with the Second Circuit's conclusion in *Golden Hill*, the doctrine of primary jurisdiction requires that this court stay the proceedings with the consent of the defendant in order to furnish the BIA with an opportunity to make its determination on Paucatuck's application. "Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill*, supra, 39 F.3d 58–59. "The primary jurisdiction doctrine serves two interests: consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions

---

[7] The majority attempts to make much of the fact that *Golden Hill* was a civil action, and the present case is a criminal action. I am bewildered by this alleged distinction in light of the basic fact that a tribe that is officially acknowledged by the BIA is just as much an "Indian tribe" for purposes of criminal jurisdiction as it is for civil matters.

of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims." Id., 59. "A federal agency and a . . . court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track— although at different times—to attain the statute's ends by their coordinated action." Id.

If, after a reasonable period of time, the BIA has still not taken definitive action with respect to the Paucatuck tribe, or if the defendant fails to agree to such a stay, the trial court should then determine the status of the Paucatuck tribe.[8] See *Mashpee Tribe* v. *New Seabury Corp.*, 592 F.2d 575, 581 (1st Cir. 1979) (recognizing that the determination of official tribal status, "though developed and interpreted in part with the

---

[8] The majority argues that "[a] lengthy stay like that imposed by the Second Circuit in *Golden Hill* likely would run afoul of a defendant's constitutional and statutory speedy trial rights." The majority, however, presupposes that the defendant would be unwilling to consent to a stay. Furthermore, the majority claims that "the legal and practical difficulties of a stay in a criminal case would be greatly exacerbated in a case in which a defendant was incarcerated pending his or her trial." These perceived difficulties, however, have no relevance to whether a stay should be ordered in this case because the defendant clearly is not incarcerated and the charge is merely an infraction.

Moreover, the majority argues that, even if the defendant were willing to consent to a stay, the public interest in speedy disposition of criminal charges counsels against such a stay. In my view, the defendant's right to be tried before a federal court outweighs any such public interest with respect to this breach of peace charge. Additionally, this court cannot be blind to the defendant's motive that resulted in his arrest—the preservation of the reservation. Finally, as I point out in this dissent, if the defendant fails to consent to the stay or if the stay would be impractical or for some other reason would not be appropriate, then the doctrine of primary jurisdiction evaporates and the trial court would determine the status of the tribe. See *Golden Hill*, supra, 39 F.3d 60–61.

expert help of historians and anthropologists, [is] not so technical as to be beyond the understanding of judges or juries"); cf. *Golden Hill,* supra, 39 F.3d 60–61 (staying action for eighteen months for BIA to make ruling).

Accordingly, I would reverse the defendant's conviction and remand the case to the trial court to determine whether the defendant would consent to a stay until such time as the BIA makes its determination or such other agreed upon time.[9] If the defendant does consent, and no other reason exists for not deferring to the BIA, the trial court should enter an order staying the criminal prosecution of the case. Upon the BIA making its determination, the stay should be lifted and this case should proceed according to law. If the defendant fails to agree to the stay, or for some other reason a stay should not be entered, or if the BIA fails to act within a reasonable time, I would then direct the trial court to conduct the necessary evidentiary hearing in order to determine the status of the Paucatuck tribe.

Accordingly, I dissent.

---

[9] I find significant the underlying factual predicate of the infraction—that is, the alleged breach of the peace—results from the defendant's attempt to prevent the road crew from disturbing an area that contained sensitive archaeological remains. In view of the factual predicate of the infraction, the fact that the Paucatuck tribe has been recognized since time immemorial by the colony, and now by the state, and that a decision is forthcoming by the BIA, the prudent action in this case requires that we stay our proceedings.